725 A.2d 549

**Diane SHOEMAKER et al.**

**v.**

**Judee G. SMITH et al.**

**No. 44, Sept. Term, 1998.**

Court of Appeals of Maryland.

March 10, 1999.

144

Charles S. Fax (Andrew J. Toland, Dana M.S. Wilson, Shapiro and Olander, on brief), Baltimore, for Petitioners.

Phillip F. Scheibe, County Atty.; John F. Breads, Jr., Senior Asst. County Atty., Anne Arundel County, Annapolis; Barbara L. Holtz, Acting County Atty., Sean D. Wallace, Deputy County Atty., Jay H. Creech, Associate County Atty., Upper Marlboro, for Prince George's County, MD, Virginia W. Barnhart, County Atty., John E. Beverungen, Asst. County Atty., Towson, for Baltimore County, MD, Amicus Curiae.

Joseph A. Schwartz, III, Baltimore, for Respondents.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

WILNER, Judge.

The immediate issue before us is a procedural one—whether the Court of Special Appeals erred in dismissing petitioners' appeal from an interlocutory order denying their motion for summary judgment, upon a finding that the appeal did not fall within the collateral order doctrine. The motion for summary judgment was based on a claim of immunity under the Maryland Tort Claims Act (Maryland Code, § 12–105 of the State Government Article and § 5–522 of the Courts and Judicial Proceedings Article), and, to resolve the procedural issue, we need to determine the standard of "malice" for purposes of § 5–522 and consider the effect of certain findings made by Judge Alexander Williams, of the United States District Court for the District of Maryland, in a related action. We shall affirm the judgment of the Court of Special Appeals.

## BACKGROUND

This lawsuit had its genesis in an investigation by personnel of the St. Mary's County Department of Social Services (DSS) and the county Sheriff's Department into possible child abuse allegedly perpetrated by Danny Smith against his three children, Donna, Ben, and Travis. The investigation culminated in an attempt, on June 17, 1992, by Sheriff's Deputies Diane Shoemaker, Mickey Bailey, and Robert Hall and DSS social worker Monica Bankins, to remove Ben and Travis, then ages

15 and 10, respectively, from their home. During the removal operation, the boys, who did not want to leave and who resisted, were forcibly restrained, handcuffed, threatened, driven away, and detained without benefit of counsel for several hours at a police station. Not until their lawyer arrived and took charge of them were they presented to a court and released to their parents. All proceedings with respect to them were eventually dismissed. Through their mother, Judee Smith, the boys filed two lawsuits—one in U.S. District Court and this one in the Circuit Court for St. Mary's County. The Federal action was dismissed against all defendants. The only defendants before us, as petitioners in this appeal, are Sheriff's Deputies Shoemaker and Bailey.

On October 31, 1991, Ms. Bankins received a call from one Cathy Meyers, who was then serving as a psychotherapist for Donna, and who apparently reported the prospect of sexual abuse of Donna by her father. Ms. Bankins and Deputy Shoemaker interviewed Donna that same day. Although Ms. Bankins said that Donna did not give them a lot of information at that time, Bankins's notes indicate that Donna accused her father of having touched her in the vaginal area and having tickled her between the legs. She also recounted having been hit by her father with a leather strap while she was in the bathtub. When those events occurred is not clear. Donna, then 17 years old, had been in out-patient therapy for a number of years and, on two earlier occasions, had been hospitalized for psychiatric problems. There is some reference in the record to a protective service investigation that had been closed about five years earlier, but there are no details with respect to the investigation.

The next day, Ms. Bankins and Deputy Shoemaker interviewed Mrs. Smith, who described Donna as a "real discipline problem" and "very angry," but acknowledged that she and her husband did spank. Ms. Bankins had Mrs. Smith sign a service agreement to follow through with counseling with Cathy Meyers and not to use belts or any type of corporal punishment on Donna. There is no evidence that the Smiths repudiated or failed to comply with that agreement. Within a

week, after a further interview with Donna, Ms. Bankins filed a CINA (child in need of assistance) petition in the juvenile court, and Donna was removed from the home. She eventually ended up at Sheppard–Pratt Hospital in Baltimore. At the time, in November, the focus was entirely on Donna, although Ms. Bankins developed some concern about Ben and Travis as well, simply because they were siblings in the same household. She told Mrs. Smith at the shelter hearing for Donna that she wanted to talk to the boys, but Mrs. Smith, believing that Donna was fabricating her story of abuse, felt that such an interview was not necessary.

In conjunction with the CINA case, Donna and her parents were evaluated by Dr. Nicholas Kirsch, a psychologist. In his report of December 23, 1991, Dr. Kirsch recounted Donna's charge of sexual abuse by her father, including vaginal penetration. Although he made clear that the tests he administered could not determine conclusively whether sexual abuse had occurred or, if it had occurred, who the perpetrator was, the results were "consistent with a personality system severely damaged in certain areas due to severe psychological terror and abuse." The test results, he said, were highly suggestive of a dissociative disorder, possibly multiple personality disorder "that are perhaps always the result of chronic sexual and/or physical abuse during childhood." Dr. Kirsch reported inconclusive results with respect to both parents. It was "virtually impossible" to determine whether Mr. Smith physically or sexually abused Donna. The test results were consistent both with a profile for known offenders and with a healthy, well-adapted profile but appeared "to lend most support to the hypothesis that the probability of Mr. Smith committing sexual or physical abuse is in the moderate-high range relative to the general adult male population." As to Mrs. Smith, he said it was unlikely that she would consciously allow abusive relationships in her family, but he then opined that she had a personality profile "with a higher than average chance of accommodating the sort of chronic but secretive abuse that is alleged in this case." Dr. Kirsch recommended that Donna not reside or have unsupervised visits with her father.

Her concern heightened by Dr. Kirsch's report, Ms. Bankins, together with Deputy Shoemaker but without any advance notice to Mr. or Mrs. Smith, attempted to interview Ben and Travis at their schools on January 6, 1992. Travis's school refused to permit the surprise interview.[1] The investigators succeeded in talking with Ben for about five minutes before Mr. Smith arrived and terminated the interview. During the brief conference, Ben told Ms. Bankins and Deputy Shoemaker that Donna was lying and that she used to make up stories about him. On January 21, 1992, Deputy Shoemaker, along with other law enforcement officers, entered the Smith home in order to execute a search warrant. The record before us does not reveal who issued the warrant, on what basis, or what the officers were searching for. What is relevant is what occurred in the home, and, for that, we may take as fact, for purposes of this appeal, the finding by Judge Williams:

> "Several officers entered through the front door, however, others entered through a door in the downstairs area where they found Benjamin and Travis playing. The officers ordered the boys to go upstairs, to sit with their hands in their laps in plain sight, not to move and not to speak. When Benjamin asked questions about what was going on and Travis began to cry uncontrollably, [Officer] Hall and other officers threatened that if they were not quiet the officers would handcuff them and take them to a boys' home. Eventually Hall, Shoemaker and other officers left the Smith home with Mr. Smith in custody."

Several events followed this intrusion into the home. Mr. Smith was arrested, held for an hour or so, and then released.

---

1. Travis attended the Lexington Park Christian School. The pastor of the church, who apparently acted as principal of the school, stated in an affidavit that when Ms. Bankins and Deputy Shoemaker came to interview Travis, he informed them that he needed 24 hours to consult with the parents, that he spoke with the parents, who informed him that they were not opposed to the interview but wanted someone to sit in on it, that the pastor agreed to do so, but that neither Ms. Bankins nor Deputy Shoemaker ever followed up. According to Pastor Dyer, they knew that he was available and that Ben and Travis were also available.

In February, Ms. Bankins and the county attorney representing DSS filed CINA petitions against Ben and Travis. The petitions alleged (1) that "[b]ased on the parents interference with the lawful police investigation of abuse within the family, it was impossible to rule out physical or emotional abuse of the younger sibling in the house when a report of abuse was made regarding an older child in the family," (2) "[a] report of corporal punishment of [the children] with use of a belt," (3) a "[s]tatement by the father that admits the use of corporal punishment," and (4) the "inability of the mother to keep the children safe." It is not clear what, if anything, came of the CINA petitions. An attorney, David Densford, was appointed by the court to represent the children. Because of the publicity and intrusions, the Smiths sent the boys to stay for a while with their grandparents in Texas. The authorities, though informed of that fact, made no attempt to have the children returned or to pursue matters in Texas. According to Travis, they remained in Texas for two months and then returned to their parents' home.

Contemporaneously with the CINA petitions, Mr. Smith was charged criminally with a variety of offenses committed against Donna, including rape, sexual offenses, and child abuse. Those charges were dismissed in August, 1993 after a trial that resulted in a hung jury.

In March, 1992, Ms. Bankins received a Report of Suspected Child Abuse from Dr. Joyanna Silberg, a therapist for Donna at Sheppard–Pratt Hospital. Donna had recounted to Dr. Silberg episodes of Satanic rituals through "the church" occurring at different parents' homes, including her home. She described children between three and eleven years old being placed on a table and poked with sticks and needles by a man in a black robe. These rituals, she said, occurred in at least four churches in various States. Donna expressed concern for the safety of her "brother" but did not indicate whether her concern was for Ben, for Travis, or for both of them. By June, the boys had returned from Texas; indeed, the record indicates that they returned near the end of April.

On June 9, Ms. Bankins had another interview with Donna at Sheppard–Pratt. She taped the interview, but, by the time of her deposition in December, 1995, much of the tape had been erased. Donna apparently expressed concern that Travis might be in danger of ritualistic abuse associated with the upcoming summer solstice, "where there are certain types of either sexual acts or physical acts that take place." Donna's concern, in Ms. Bankins's words, "increased the imminent danger" for Travis.[2]

On June 10—the day after Ms. Bankins's conversation with Donna—Ben and Travis were evaluated by Dr. Nancy Davis, a psychologist. Although petitioners contend in their brief that Dr. Davis was hired by the parents, her report states clearly that the children were referred by DSS, a statement confirmed by Ms. Bankins in her deposition testimony.[3] Ben told Dr. Davis that hers was his fourth psychological evaluation

---

**2.** It is not clear why Ms. Bankins was particularly concerned at that point. In her deposition testimony, she said that it was not until June 15 that Donna informed her that the boys had returned from Texas. The implication is that, on June 9, she still believed Ben and Travis were in Texas and there is no indication that she anticipated their return at that time.

**3.** In her report on Travis, Dr. Davis stated that the children were referred for testing by Sharon McKinley, from the county DSS. Ms. McKinley was identified as Ms. Bankins's supervisor, who accompanied her on her June 9 visit to interview Donna and with whom she conferred before deciding to remove the children from their home. There is a wider dispute and some ambiguity with respect to the psychological evaluations. Ms. Bankins complained that the parents were uncooperative in having Ben and Travis evaluated and that several appointments were made that were not kept. Dr. Davis, on the other hand, stated in her report on Travis that the parents had consented to the evaluation and simply asked that the appointments be made through the children's attorney, Mr. Densford. Ms. Bankins also claimed that, at the time the children were removed from the home, on June 17, she was unaware that they had been evaluated by Dr. Davis. Dr. Davis's report is undated and does not indicate to whom it was sent or when it was sent. The testing occurred on June 10, 1992. It appears that Ms. Bankins may have been unaware that the evaluation had occurred because the arrangements were made through Mr. Densford. It appears clear, however, that Ms. McKinley knew that Dr. Davis had been retained to perform the evaluations. When she became aware of Dr. Davis's conclusions is not revealed in the record.

and, though cooperative, he was angry at having to be tested again. He denied the stories being told by Donna. Dr. Davis reported that his behavior during the evaluation and his responses to the personality and intelligence tests "are not consistent with the type of behaviors usually found in adolescents who have been abused." She said that the results did not rule out the possibility that he may have been abused but that it was unlikely that he had experienced significant abuse over any length of time. As to Travis, Dr. Davis made clear that the evaluation was to determine the probability of sexual and ritualistic abuse occurring in the home. Although she found Travis to have experienced a great deal of stress resulting from his move to Texas, having his house searched by the police, and having Donna, with whom he was close, removed from the home after making allegations of abuse, Dr. Davis did not believe that he had been ritualistically or sexually abused "in a long-term, traumatic way." She recommended only that Travis participate in individual therapy to help him deal with the trauma in his family and regain a more positive self-image; she made no recommendation that he, or Ben, be removed from the home.

On June 15, Ms. Bankins learned that Ben and Travis were back with their parents. The next day, after discussing the matter with Ms. McKinley, she decided to remove them from their home, for fear that they were in imminent danger of ritualistic abuse in conjunction with the summer solstice. This fear emanated, according to Ms. Bankins, from Donna's revelations and from Dr. Silberg's report, which, itself, mostly recounted Donna's statements. Ms. Bankins conceded that she made no effort to contact the parents, the two boys, any neighbors, the pastor, Mr. Densford, or Dr. Davis. Instead, Ms. Bankins or Ms. McKinley arranged for Deputy Shoemaker to assist them in the removal the next day. When asked whether her decision would have been altered had she known of Dr. Davis's conclusions, Ms. Bankins said, "I'm not sure."

There are two provisions in the Maryland Code permitting a child to be removed from his or her home on an emergency basis. Section 3–814 of the Courts and Judicial Proceedings

Article, which is part of the Juvenile Causes law, permits a law enforcement officer or other person authorized by the juvenile court to take a child into custody upon reasonable grounds to believe that the child is in immediate danger from his or her surroundings and that removal is necessary for the child's protection. That law also requires, however, that, with all reasonable speed, the child be returned to the parents or taken to a place of shelter care designated by the court. Section 5–709 of the Family Law Article permits a DSS agent to enter the household if the agent (1) has previously been denied the right of entry, and (2) has probable cause to believe that a child is in serious, immediate danger. With the assistance of a law enforcement officer, the agent may remove the child without prior approval by the juvenile court if the agent believes that the child is in serious, immediate danger. If the child is removed, DSS must have the child thoroughly examined by a physician.

It is evident that Ms. Bankins intended to act pursuant to § 5–709, rather than § 3–814. Her intent was to seize the children and take them from Lexington Park, in St. Mary's County, to the Psychiatric Institution for Montgomery County, where they "would be evaluated both physically and psychologically to see if there were any indications of child abuse." It appears that Ms. McKinley had made arrangements with the Psychiatric Institute, although the record is silent as to why they chose that facility, many miles away.

On the morning of June 17, Ms. Bankins and Ms. McKinley rendezvoused with Deputy Shoemaker and two other sheriff's deputies. The plan was for Ms. McKinley to go to the door, present Mrs. Smith with a "limited custody sheet" which is neither in the record nor explained in the record, and for Deputy Shoemaker and Deputy Bailey to seize the boys, put them in a car, and drive them to the Psychiatric Institution. The operation did not go as planned. Ben was eating breakfast. When he saw Ms. Bankins rush into the house, he called for his brother and fled. As he ran out of the door, he saw Deputy Shoemaker with her hand on her pistol, as if getting ready to draw the weapon. The dog was barking, and Deputy

Shoemaker yelled at Ben that if he did not quiet the dog, she would kill it.[4] Ben ran to the gate in the back, where he encountered two deputies, who ordered him to stop. They seized him, pushed him to the ground, pulled his arms behind him, and handcuffed him. When he yelled at them, they tightened the cuffs. Finally, he was put in a squad car. Travis, barefoot and still in his pajamas, was playing with a friend when Ben yelled for him to run. He also fled, but was captured by Deputy Shoemaker, handcuffed, and put in the squad car. Judge Williams added in his recitation of the facts:

> "Both boys were crying and screaming for their parents. When Benjamin began to kick the back of the front seat, one of the deputies indicated that, 'if you don't shut the f[___] up we're going to take you to a mental hospital.' Later, when Benjamin refused to calm down, Bailey indicated that, 'if you don't shut up I'm going to slap you in a straightjacket.'"

With Ben and Travis handcuffed in the back of the car, Ms. Bankins and Deputy Shoemaker headed for the Psychiatric Institute. Ben stated that he wanted to talk with his lawyer, Mr. Densford, but, according to Judge Williams, Shoemaker responded that he would not be permitted to do so until he "settled down and talked to them nicely." When Ben asked where they were being taken, Shoemaker said "that he did not need to know." At some point along the way, apparently when they were already in Charles County, Deputy Shoemaker received radio instructions to turn around and proceed instead to a police outpost. When they arrived at the outpost, Deputy Shoemaker removed the cuffs from Travis but left Ben shackled. Ben again asked to call Mr. Densford but was told that the telephone at the police station was inoperable.[5]

---

4. Those statements were taken from Ben's deposition. Judge Williams, for purposes of ruling on a motion to dismiss, took as fact that Shoemaker "unsnapped the buckle on her gun holster and told the boys to stop. She then put her hand on the gun and told the boys that if they did not shut up their barking dog that she was going to shoot the dog."

5. The record does not establish whether it really was not possible to make an outgoing call. There is evidence that Mr. Densford was able

Judge Williams found that, while at the post, the boys were told that they were being held for their own good and that they were removed from their home because their father abused them. Ms. Bankins expressed concern that she would be sued over what occurred, but Deputy Shoemaker responded that she (Shoemaker) "would cover for her." The group remained at the outpost for several hours until Mr. Densford arrived. He directed that Ben's handcuffs be removed, eventually took charge of the boys, and took them to court for an emergency hearing. The court released them to their parents. They never were examined by a physician, as required by Family Law Article, § 5–709.

At some point in 1994, Mrs. Smith, on behalf of Ben and Travis, filed a four-count complaint in U.S. District Court, charging Ms. Bankins and Deputies Shoemaker, Hall and Bailey with a violation of the boys' civil rights, 42 U.S.C. § 1983, Deputies Shoemaker, Hall, and Bailey with assault, Deputies Shoemaker and Hall with battery, and all four defendants with false imprisonment and violations of the Maryland Constitution.

In October, 1995, the court dismissed the action against Bankins, finding, essentially, that, in removing the boys, she acted under the authority of Family Law Article, § 5–709, did not use excessive (or any) force, and did not deprive the boys of procedural or substantive due process. All claims against Deputy Hall were also dismissed, largely on the ground that there was no allegation that he used any force against the boys. Only the Federal claims against Shoemaker and Bailey based on their use of excessive and unreasonable force and the State law claims against them were kept alive, apparently to permit further discovery.

In August, 1996, the court disposed of the remaining claims by granting Shoemaker's and Bailey's motion for summary judgment. With respect to the Federal claim under § 1983,

---

to call to the station and speak with either Deputy Shoemaker or Ms. Bankins, so it would seem that the telephone was not entirely inoperable.

the court applied the objective test required by Supreme Court jurisprudence in an excessive force case, namely, whether the officers' actions were " 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443, 456 (1989). Against that standard, the court found that the officers' conduct, under the circumstances, was objectively reasonable and that the force applied was not excessive. Concluding that they had a legal basis upon which to remove the children, the court found that the force used to achieve that result was appropriate and justified. As that ruling exhausted the Federal claim, the court exercised its discretion and dismissed the pendant State law claims. No appeal was taken from the court's final judgment.

Mrs. Smith and her husband, for themselves and the two boys, had filed this action in St. Mary's County in June, 1995, but kept the case dormant during the pendency of the Federal action. In Counts I and II, they charged all defendants with violations of Articles 24 (due process) and 26 (unlawful seizure) of the Maryland Declaration of Rights; in Count III (mislabeled Count II), Ben and Travis charged Hall, Bailey, and Shoemaker with assault; in Count IV (mislabeled Count III), the boys charged Hall and Shoemaker with battery; and in Count V (mislabeled Count IV), the boys charged all defendants with false imprisonment. The claims against Hall and Bankins were dismissed by stipulation. The remaining defendants—Shoemaker and Bailey—moved for summary judgment on the alternative grounds that (1) they were entitled to immunity under the Maryland Tort Claims Act; (2) the plaintiffs' claims were not cognizable under the Declaration of Rights; (3) their claims were barred by collateral estoppel, based on the Federal court judgment; and (4) the defendants' acts were performed with legal justification and were supported by probable cause. The court granted summary judgment with respect to Counts I and II—the Constitutional claims—on the basis of collateral estoppel, but it denied the motion with respect to the common law claims embodied in

Counts III, IV, and V. Those claims, the court held, had not been ruled upon by Judge Williams, and they were therefore not barred by collateral estoppel. The court also concluded that there were facts in dispute relevant to whether Deputies Shoemaker and Bailey committed the torts and acted with malice.

Notwithstanding the interlocutory nature of the court's ruling, Deputies Shoemaker and Bailey noted an appeal, claiming the right to immediate appellate review under the collateral order doctrine. The Court of Special Appeals rejected that claim and dismissed the appeal as not allowed by law. We granted *certiorari* to consider whether the intermediate appellate court erred in dismissing the interlocutory appeal and, contingently, whether the circuit court erred in denying petitioners' motion for summary judgment as to the common law claims of assault, battery, and false imprisonment. We shall affirm the appellate judgment dismissing the appeal and need not, therefore, rule on the correctness of the circuit court ruling.

## DISCUSSION

### Nature of Immunity Available to Petitioners

Section 12–105 of the State Government Article provides that "State personnel" have the immunity from liability described in § 5–522(b) of the Courts and Judicial Proceedings Article. Section 12–101(a)(6) includes a county deputy sheriff within the meaning of "State personnel." Deputies Shoemaker and Bailey therefore have the immunity provided for in § 5–522(b), with respect to the open common law claims.

Section 5–522(b) grants immunity to State personnel "from suit in courts of the State and from liability in tort for a tortious act or omission that is within the scope of [their] public duties ... *and is made without malice or gross negligence,* and for which the State or its units have waived immunity under Title 12, Subtitle 1 of the State Government Article...." (Emphasis added.) Under § 12–104 of the State Government Article, read in conjunction with § 5–522(a)

of the Courts and Judicial Proceedings Article, the State has waived its immunity in tort actions, subject to certain money limits and subject to the caveat that immunity is *not* waived for the tortious act or omission of State personnel that is not within the scope of their public duties or that is made with malice or gross negligence. It is clear from these provisions that Deputies Shoemaker and Bailey have no immunity under the statute for conduct committed with "malice or gross negligence." The immunity available to them, therefore, is a qualified, not an absolute, one. The plaintiffs have not contended that the deputies acted with gross negligence; the key is whether they acted with malice.

The thrust of petitioners' case, both as to appealability under the collateral order doctrine and as to the substantive correctness of the ruling denying their motion for summary judgment, is that, in concluding that they did not use excessive or unreasonable force, Judge Williams effectively held that they did not act with malice, and that his ruling collaterally estopped the plaintiffs from asserting otherwise. Thus, through application of collateral estoppel, they regard the lack of malice, and with that lack their entitlement to statutory immunity, established as a matter of law. The statutory immunity, in their view, conferred not just an immunity from ultimate liability but also the right not to be forced to trial, and that is what gives them the right to an immediate appeal.

At one time, the qualified immunity available to most Executive Branch officials charged under § 1983 was in the nature of a "good faith" immunity that had both objective and subjective components. That immunity would be defeated if the official *"knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the rights of the [plaintiff], or if he took the action *with the malicious intention* to cause a deprivation of constitutional rights or other injury." *Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396, 409 (1982), quoting from *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214, 225 (1975) (emphasis in *Harlow*).

The *Harlow* Court found, from experience, that the subjective component exacted too high a price by forcing government officials, in too many instances, to devote time and energy in defending non-meritorious litigation, diverting their attention from their official duties. Observing that immunity under § 1983 was generally available only to officials performing discretionary functions, the Court noted that "the judgments surrounding discretionary action almost inevitably are influenced by the decisionmaker's experiences, values, and emotions," and that those variables "explain in part why questions of subjective intent so rarely can be decided by summary judgment." *Harlow v. Fitzgerald, supra,* 457 U.S. at 816, 102 S.Ct. at 2737, 73 L.Ed.2d at 409. The subjective element of good faith, or lack of malice, was thus incompatible with the desire that insubstantial claims should not proceed to trial—that "bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery." *Id.* at 817–18, 102 S.Ct. at 2738, 73 L.Ed.2d at 410. Accordingly, the Court eliminated that element from the calculus and re-articulated the remaining objective element. The new standard for immunity under § 1983 was stated thusly: "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow, supra,* 457 U.S. at 818, 102 S.Ct. at 2738, 73 L.Ed.2d at 410. On summary judgment, the Court continued, "the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred." *Id.* The good or evil intentions of the official play no direct role in this analysis.

The public interest in deterring lawless conduct, the Court declared, was sufficiently protected by the singular objective test: "Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of

action. But where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences.' " *Id.* at 819, 102 S.Ct. at 2739, 73 L.Ed.2d at 411, quoting in part from *Pierson v. Ray,* 386 U.S. 547, 554, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967).

A similar approach was taken when the § 1983 complaint is grounded on Fourth Amendment violations arising from excessive force used by officers in seizing a person. In *Graham v. Connor, supra,* 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443, 456, the Court expressly rejected the four-part guideline test established in *Johnson v. Glick,* 481 F.2d 1028 (2d Cir.1973), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973), one prong of which was whether the force was applied maliciously or sadistically for the purpose of causing harm. Instead, the Court declared that, as in other Fourth Amendment contexts, "the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* The Court continued that "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.* It restated the principle at the conclusion of its opinion: "The Fourth Amendment inquiry is one of 'objective reasonableness' under the circumstances, *and subjective concepts like 'malice' and 'sadism' have no proper place in that inquiry.*" *Id.* at 399, 109 S.Ct. at 1873, 104 L.Ed.2d at 457 (emphasis added).

Judge Williams, as noted, applied the *Graham v. Connor* standard, as the remaining § 1983 complaint against Deputies Shoemaker and Bailey was based on the alleged use of excessive and unreasonable force. That is not the test for determining qualified immunity under the State Tort Claims Act, however. Unlike the judicially-fashioned purely objective

tests for immunity under § 1983, the General Assembly has made clear that State personnel do *not* enjoy immunity under § 5–522(b) if they act with malice. The question posed by petitioners is whether the State and Federal standards effectively are the same—whether an allegation of malice, for purposes of § 5–522, is necessarily rebutted as a matter of law upon a finding that the defendant acted reasonably and without excessive force.

The fallacy in petitioners' argument lies in the fact that, in adopting a purely objective test for purposes of § 1983, the Supreme Court has clearly and expressly eliminated malice, which it regarded as the embodiment of subjectivity, from the immunity doctrine. In enacting the State Tort Claims Act, the General Assembly just as clearly and expressly retained the subjective element for immunity purposes. In doing so, it has provided a greater separation between substantive liability and immunity and simply struck a different balance. The Legislature has decided that, when State personnel act maliciously, they, and not the State, must bear the risk. The predominant and laudable public policy is to discourage State personnel from acting with malice in the performance of their public duties. In order to side with petitioners, we would have to act inconsistently with that policy and either read the caveat of malice out of the statute or define the word "malice" in such a sterile way that it would have no real meaning.

The word "malice" has been a troublesome one in the law, because it has been used in many different contexts and, as a result, has been defined in different ways. See discussion in *Bowden v. Caldor*, 350 Md. 4, 23–25, 710 A.2d 267, 276–77 (1998). In an attempt to provide some guidance, the courts began to distinguish between "actual malice," which connoted an evil intent, ill will, an improper motive, or an intent to harm, and "implied malice," which involved a range of conduct more culpable than simple negligence but less pernicious than "actual malice." As noted by us in *Montgomery Ward v. Wilson*, 339 Md. 701, 728–29 n. 5, 664 A.2d 916, 930 n. 5 (1995), however, even those terms admitted of some ambiguity and overlap. Except through a brief statement in one case, we

have not defined the word "malice" for purposes of § 5–522, but it is clear from that statement, as well as from our analogous case law, that it embodies the very subjective element discarded by the Supreme Court for purposes of § 1983.[6] The Court of Special Appeals has correctly reached that conclusion in a number of cases.

In *Sawyer v. Humphries*, 322 Md. 247, 587 A.2d 467 (1991), we considered an "excessive force" complaint against a State police officer who pleaded immunity under § 5–522 (then codified as § 12–105 of the State Government Article). Our focus was principally on the first condition to immunity— whether the defendant was acting within the scope of his duties—but we addressed the plaintiff's allegation of malice as well. The defendant had thrown rocks at the plaintiff's car and then savagely assaulted him. We held:

> "These facts set forth by the plaintiffs directly showed malice. When someone, without provocation or cause, throws rocks at two other persons, he is obviously demonstrating *ill will* towards those persons. Wrestling another to the ground, pulling his hair, and hitting him in the face, again without cause or provocation, is certainly malicious conduct. When one person states that he is going to kill another, he clearly harbors *actual malice* toward the victim."

*Id.* at 261, 587 A.2d at 474 (emphasis added).

The term and concept of "actual malice" has an historic meaning in Maryland law that is in full keeping with the "ill

---

**6.** In *Brewer v. Mele*, 267 Md. 437, 445, 298 A.2d 156, 161 (1972), decided before the enactment of the State Tort Claims Act, when only common law governmental immunity existed, we noted that "[w]e have never been called upon to decide that quality of malice or the means of its proof necessary to forestall governmental immunity. If it be some affirmative showing of ill will, improper motivation, or evil purpose, the undisputed facts might well reveal its total absence prior to trial and permit the assertion of the qualified immunity." In *Carder v. Steiner*, 225 Md. 271, 274, 170 A.2d 220, 221 (1961), and *State, Use, Clark v. Ferling*, 220 Md. 109, 114–15, 151 A.2d 137, 140 (1959), we held that a warden had no liability for injuries to a prisoner absent an allegation and showing of "malice or evil purpose."

will" noted in *Sawyer.* In *Montgomery Ward v. Wilson,* *supra,* 339 Md. 701, 728–29 n. 5, 664 A.2d 916, 930 n. 5, we noted that the term "actual malice" referred to conduct "characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill will or fraud. . . ." We contrasted that concept of "actual malice" from "implied malice," which, in earlier cases, had been defined to describe conduct that was grossly negligent or involved a wanton or reckless disregard of another's rights, or, in a malicious prosecution case, actions taken without probable cause. For purposes of determining the allowability of punitive damages, it is the evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill will, or fraud that normally must be present, not merely gross negligence or wanton or reckless conduct. *See Owens–Illinois v. Zenobia,* 325 Md. 420, 601 A.2d 633 (1992); *Scott v. Jenkins,* 345 Md. 21, 690 A.2d 1000 (1997); *Bowden v. Caldor, supra,* 350 Md. 4, 23, 710 A.2d 267, 276.[7]

The Court of Special Appeals has long applied that, or some similar, standard of "actual malice" in defining "malice" for purposes of public official immunity under common law or under State and local tort claims laws. *See, for example, Arrington v. Moore,* 31 Md.App. 448, 464, 358 A.2d 909, 918, *cert. denied,* 278 Md. 729 (1976), and *Leese v. Baltimore County,* 64 Md.App. 442, 480, 497 A.2d 159, 179, *cert. denied,* 305 Md. 106, 501 A.2d 845 (1985) (actual malice needed to defeat official immunity requires "an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate," the purpose being to deliberately and wilfully injure the plaintiff); *Davis v. DiPino,* 99 Md.App. 282, 290–91, 637 A.2d 475, 479 (1994), *rev'd on other grounds,* 337 Md. 642,

---

7. As noted in *Bowden,* special or additional standards have been devised for punitive damages in defamation and certain other torts. The standard for most torts, however, is the kind of "actual malice" described above, which is in keeping with the function of punitive damages to punish for "egregiously bad conduct." *Bowden,* 350 Md. at 22, 710 A.2d at 276, quoting from *Owens–Corning v. Garrett,* 343 Md. 500, 537–38, 682 A.2d 1143, 1161 (1996).

655 A.2d 401 (1995); *Nelson v. Kenny,* 121 Md.App. 482, 487, 710 A.2d 345, 348 (1998).

██ This, we believe, is the appropriate test—the one that the Legislature intended to be applied. For one thing, the fact that it is an alternative to gross negligence, which also will defeat the qualified immunity, indicates clearly that the Legislature conceived of malice as something beyond the merely reckless or wanton conduct that would be embodied within gross negligence. That conception of malice, moreover, provides a reasonable measure of protection to the State, to State personnel, and to those injured by the conduct of State personnel. It may well be in this case that, if the trier of fact concludes that petitioners acted reasonably and without excessive force, it will return a judgment in their favor on the merits. We are not dealing here with the merits, however, which have yet to be decided, but with the issue of immunity. The question raised for purposes of immunity under the State Tort Claims Act is whether a jury could reasonably find that petitioners' conduct, given all of the existing and antecedent circumstances, was motivated by ill will, by an improper motive, or by an affirmative intent to injure the boys. As the Supreme Court observed in *Graham v. Connor, supra,* that motive or animus may exist even when the conduct is objectively reasonable. If it does, there is no immunity under the State Tort Claims Act.

### Appealability of Interlocutory Ruling Denying Defense of Qualified Immunity

The question of whether a defendant claiming sovereign, governmental, or public official immunity may invoke the collateral order doctrine to obtain immediate appellate review of an interlocutory order rejecting the immunity defense has been before this Court and the Court of Special Appeals on a number of occasions in the past few years. The most recent definitive discussion of the issue occurred in *Artis v. Cyphers,* 100 Md.App. 633, 642 A.2d 298 (1994). We summarily affirmed the decision of the Court of Special Appeals in that

case for the reasons cited in its opinion *Artis v. Cyphers,* 336 Md. 561, 649 A.2d 838 (1994).

 *Artis* and our earlier *per curiam* decision in *Bunting v. State,* 312 Md. 472, 540 A.2d 805 (1988) set forth the governing principles, which are clear and workable. We may summarize them as follows. The right to seek appellate review ordinarily must await the entry of a final judgment, disposing of all claims against all parties. There are three exceptions to that rule in Maryland: appeals from interlocutory rulings specifically allowed by statute (see, for example, §§ 12–303 and 12–304 of the Cts. & Jud. Proc. Article and Article 27, § 776); immediate appeals permitted under Maryland Rule 2–602(b); and appeals from interlocutory rulings allowed under the common law collateral order doctrine. The only asserted basis for this appeal is the collateral order doctrine. That doctrine has four requirements, all of which must be satisfied to permit an immediate appeal from an interlocutory order: the order appealed from must conclusively determine the disputed question; it must resolve an important issue; it must be separate from the merits of the action; and it must be effectively unreviewable on appeal from the ultimate final judgment.

Although disputes may arise with respect to any of the four requirements, appeals taken from interlocutory orders denying dispositive motions based on immunity most often raise questions with respect to the first, third, and fourth requirements—whether the immunity issue has been conclusively resolved, whether it hinges on disputed facts that go as well to the merits of the claim, and whether, if the immunity is cast as an immunity from trial, rather than just an immunity from liability, denial of the immunity defense is effectively unreviewable after the defendant has been forced to undergo the trial. These are different issues, even if they sometimes overlap. *Artis* dealt principally with the first and third requirements—whether the immunity issue was conclusively resolved and was separate from the substantive merits of the case. *Bunting* spoke to the fourth requirement.

■ In *Artis*, an ambulance driver was sued for negligence in his provision of medical assistance to a motorist who suffered a heart attack. In a motion for summary judgment, he asserted both common law public official immunity and a statutory "Good Samaritan" immunity protecting persons who render emergency medical assistance, and, when the motion was denied, he took an immediate appeal, claiming the right to do so under the collateral order doctrine. After reviewing both the Maryland and Federal cases dealing with interlocutory appeals of that kind, the Court of Special Appeals and this Court arrived at two principal conclusions: first, that an immediate appeal may not be taken from a ruling denying a motion to dismiss or for summary judgment based on official or governmental immunity—common law or statutory—unless the immunity issue can be resolved as a matter of law; and second, that such a situation likely will exist in only three circumstances—(1) when the immunity is an absolute immunity and is not defeated by malice, gross negligence, or other defense that must be proved or disproved as a matter of fact; (2) when the immunity is based on the *Harlow* standard, which, being purely objective in nature, effectively presents the immunity issue as a matter of law; [8] and (3) in that rare other case where the applicability of a qualified immunity under State law does not hinge on disputed facts or inferences and may be resolved as a matter of law.

The appeal in *Artis* was dismissed because it fell into none of those categories. The public official immunity claimed by Artis required a finding that he was a public official, that he was engaged in discretionary acts, and that his conduct was

---

8. *See Johnson v. Jones*, 515 U.S. 304, 311, 115 S.Ct. 2151, 2155, 132 L.Ed.2d 238, 246 (1995), and *Behrens v. Pelletier*, 516 U.S. 299, 305, 116 S.Ct. 834, 838, 133 L.Ed.2d 773, 783 (1996), confirming that summary judgment determinations of qualified immunity under *Harlow* are appealable "when they resolve a dispute concerning an 'abstract issu[e] of law' relating to qualified immunity ...—typically, the issue whether the federal right allegedly infringed was 'clearly established....'" *Behrens*, 516 U.S. at 313, 116 S.Ct. at 842, 133 L.Ed.2d at 788, quoting in part from *Johnson*, 515 U.S. at 317, 115 S.Ct. at 2158, 132 L.Ed.2d at 249.

not grossly negligent. The statutory Good Samaritan immunity also depended on his not having been grossly negligent. On the record presented in that case, those issues hinged on facts and inferences that were in dispute. For us to resolve those issues in an appeal from the denial of a motion for summary judgment would have required that we view the evidence in a light most favorable to the plaintiff, even though a trier of fact, not required to take such a slanted view, might resolve them in a quite different manner and thus properly reach a different legal conclusion. We approved the holding of the Court of Special Appeals:

"Whether a defendant possesses a qualified immunity is ultimately an issue of law for the court to determine. To the extent that it depends on the resolution of disputed material facts, however, some of those disputes—the existence of gross negligence *or malice,* for example—may be for the trier of fact to resolve; others—whether the defendant is a public official and, if so, whether the duty he was performing was discretionary or ministerial—will be for the court. To the extent the issue hinges on factual disputes that must be resolved by the trier of fact, the court will not be able to resolve the legal issue on preliminary motion, thereby forcing the defendant to wait until judgment has been entered."

*Artis v. Cyphers, supra,* 100 Md.App. at 653, 642 A.2d at 308 (emphasis added).[9]

*Artis* establishes a clear and workable approach with respect to the first and third prongs of the collateral order doctrine, one that preserves the respective roles of the trial and appellate courts and avoids the prospect of the appellate

---

**9.** The court added: "Where the factual issue can be resolved by the court, the parties may take advantage of Md. Rule 2–502 and have the court decide those facts, and with them the legal issue of immunity, preliminarily. In that circumstance, immediate appellate review of a ruling rejecting the qualified immunity defense would be permissible, for it would place the appellate court in no different position than if it were reviewing the rejection of an absolute immunity defense or a *Harlow* type of qualified immunity defense; the issues would be legal ones." 100 Md.App. at 653–54, 642 A.2d at 308–09.

court assuming as fact that which a trial court could properly find not to be fact. When a trial court, faced with a motion for summary judgment laden with disputes of material fact bearing on issues of malice or gross negligence, resolves those disputes in favor of the plaintiff and denies the motion, the State qualified immunity issue is ordinarily not conclusively resolved. In reviewing the evidence against the appropriate standard of proof, rather than in a light most favorable to the plaintiff, the court may reach a very different conclusion. Because the determination of malice, in particular, involves findings as to the defendant's intent and state of mind, there is much less likelihood of it presenting an "abstract issue of law."

■ The *Artis* approach militates against allowing this appeal. A jury could find from the evidence presented in the summary judgment record that Deputies Shoemaker and Bailey acted with malice, with an intent to harm Ben, Travis, or their parents, perhaps out of anger or frustration over their alleged unwillingness to cooperate with Ms. Bankins and Deputy Shoemaker in the past or over the children's resistance and attempt to elude capture. The evidence, taken in a light favorable to the plaintiffs, certainly suggests unusually rough conduct which, even if objectively reasonable, as found by Judge Williams for purposes of § 1983, is beyond that which one would normally expect from a neutral and dispassionate law enforcement officer supposedly engaged in protecting the child victims from threatened abuse. A jury could find that Shoemaker's alleged threat to kill the family dog because it was barking at the commotion, the foul language supposedly used by her or Bailey, and the alleged threats to take the children to a mental hospital and put one of them in a straightjacket were all the product of animus toward the children or their parents. There is no way that we can resolve those issues as a matter of law on this record. That is one reason why the appeal was properly dismissed.

*Bunting* provides another, equally compelling, reason why this appeal must be dismissed. That case did not involve a defense of public official or governmental immunity, but did

involve an appeal taken under the collateral order doctrine from an interlocutory ruling. Bunting moved to dismiss criminal charges against him on the ground that the State had violated the "single transfer rule" of Article III(d) of the Interstate Agreement on Detainers (Maryland Code, Article 27, § 616D(d)). Under that rule, if a detainer is lodged in Maryland against a defendant imprisoned in another State and, pursuant to his or her request, the defendant is transferred to Maryland for trial on that detainer, the defendant has a right to be tried on the detainer before being returned to the sending State. If the defendant is returned without having been tried, Article III(d) requires that the charges against the defendant be dismissed with prejudice. Bunting, incarcerated in a Federal prison in Pennsylvania, was transported to Maryland pursuant to a detainer filed with the Federal authorities. He attended a hearing on preliminary motions made by him but was returned prior to trial, and he then moved to dismiss the charges, alleging a violation of Article III(d). The motion was denied, and Bunting appealed. The Court of Special Appeals dismissed the appeal and we affirmed that judgment.

Bunting claimed the right of immediate appeal under the collateral order doctrine, arguing, among other things, that the challenged order denying his motion to dismiss would not be effectively reviewable if he had to await conviction after trial—that, like the defense of double jeopardy, the statutory right to have the charges dismissed with prejudice was in the nature of a right to avoid trial itself. We rejected his argument, noting that "[i]f all 'rights' which could be characterized in this manner were treated like the right against double jeopardy, the collateral order doctrine would largely erode the final judgment rule." *Bunting v. State, supra,* 312 Md. at 480, 540 A.2d at 808. We concluded our *per curiam* Opinion as follows:

"In sum, the idea that an issue is not effectively reviewable after the termination of trial because it involves a 'right' to avoid the trial itself, should be limited to double jeopardy claims and a very few other extraordinary situations. Oth-

erwise, as previously indicated, there would be a proliferation of appeals under the collateral order doctrine. This would be flatly inconsistent with the long-established and sound public policy against piecemeal appeals."

*Id.* at 481–82, 540 A.2d at 809.

*Bunting* makes clear that the claimed right of immunity from trial itself does not suffice to satisfy the "unreviewability" requirement of the collateral order doctrine except in "extraordinary situations." We do not regard the denial of a motion for summary judgment asserting the qualified immunity of a deputy sheriff charged with maliciously committing common law torts as an "extraordinary situation." When the facts relevant to the immunity defense are in dispute and need to be resolved based on a full credibility analysis, the decision as to immunity is *only* reviewable after that analysis has been completed.

To recapitulate, in order to proceed under the collateral order doctrine, all four prongs of that doctrine must be satisfied. *Artis* makes clear that the third prong—the conclusiveness of the adjudication—is not ordinarily satisfied unless the immunity issue can be resolved as a pure issue of law, without the court having to assume any material facts or inferences that are in dispute. Even if the *Artis* standard is met, however, *Bunting* makes clear that the fourth prong—unreviewability after final judgment—is not satisfied except in "extraordinary situations." Through those cases, in contrast to the Federal approach, we have placed significant limits on immediate appeals from interlocutory orders denying a governmental immunity defense. Petitioners' appeal was correctly dismissed.

JUDGMENT OF COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.