820 A.2d 587

**In re Sophia E. FOLEY, an Adult.**

**No. 123, Sept. Term, 2001.**

Court of Appeals of Maryland.

April 4, 2003.

Mitchell Y. Mirviss (Venable, Baetjer and Howard, LLP, Baltimore;  J. Michael Recher, Rudolph E. DeMeo of Recher & DeMeo, Towson), all on brief, for Petitioner.

Michael W. Davis (Angela B. Grau of Davis, Coover, Agnor & Barr, P.A., on brief), Columbia, for Respondent.

Margaret Fonshell Ward, Moore & Jackson, LLC, Towson, brief of Lyme Disease Foundation as Amicus Curiae filed on behalf of Petitioner.

J. Joseph Curran, Jr., Atty. Gen. of MD, Jack Schwartz, Asst. Atty. Gen., Baltimore, brief of Atty. Gen. of MD as Amicus Curiae filed on behalf of Respondent.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

ELDRIDGE, Judge.

The issue in this case is whether the Circuit Court's interlocutory order for a medical examination, under the circumstances here involved, is appealable under the collateral order doctrine. The Court of Special Appeals held that the order was appealable. We disagree.

Sophia E. Foley, a sixty-two year old woman, resides in Annapolis, Maryland, with her husband and seventeen-year-old daughter. In 1988, Sophia's husband, Michael Foley, began noticing that Sophia suffered from lapses in memory and confusion. Sophia's memory loss became progressively worse, and, in 1992, one of her physicians determined that Sophia suffered from dementia, most likely of the Alzheimer's type. Also in 1992, Sophia executed a health care power of attorney designating her husband, Michael, as her health care agent.

In 1997, one of Sophia's sisters, Eugenia Berg, filed in the Circuit Court for Anne Arundel County a guardianship petition, alleging that Sophia's dementia was caused by Lyme disease and that the health care Sophia had been receiving was inadequate because Michael failed or refused to have her tested for Lyme disease. Shortly thereafter, Michael had Sophia tested for Lyme disease, and the particular tests administered to her indicated that she was not infected by

Lyme disease. Subsequently, after a hearing, the Circuit Court dismissed the guardianship petition.

In 2000, Eugenia Berg instituted the present action by filing in the Circuit Court for Anne Arundel County a new guardianship petition, seeking appointment as co-guardian of the person of Sophia. She designated as "interested persons" herself, three other sisters of Sophia, Michael, Sophia's daughter, Sophia's father, and the Director of the Anne Arundel County Department of Social Services. Eugenia alleged that Michael had failed to pay for Sophia's adult day care at the Deerfield Adult Day Care Center, although Eugenia had provided him with money to do so.

Later, Eugenia Berg filed in the guardianship case a motion pursuant to Maryland Rule 2–423 for an examination and testing of Sophia.[1] Eugenia asserted that an examination was needed to determine whether Sophia had Lyme disease or other medical conditions that were causing her dementia and for which she was not being treated. Eugenia's position and Michael's response were summarized by the Court of Special Appeals as follows:

> "Eugenia alleged that the Lyme disease tests performed on Sophia in 1997 were not clinically sensitive enough, or were performed too long after exposure, to detect the presence of *Borrelia burgorferi*, the agent that causes Lyme disease.

---

1. Maryland Rule 2–423 states as follows:

    **"Rule 2–423. Mental or physical examination of persons.**
    When the mental or physical condition or characteristic of a party or of a person in the custody or under the legal control of a party is in controversy, the court may order the party to submit to a mental or physical examination by a suitably licensed or certified examiner or to produce for examination the person in the custody or under the legal control of the party. The order may be entered only on motion for good cause shown and upon notice to the person to be examined and to all parties. It shall specify the time and place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made. The order may regulate the filing and distribution of a report of findings and conclusions and the testimony at trial by the examiner, the payment of expenses, and any other relevant matters."

"Eugenia's motion for physical examination and testing sought to have Sophia retested for Lyme disease under a protocol prescribed by Eugenia's medical experts, Ritchie S. Shoemaker, M.D., and Anthony L. Lionetti, M.D. The testing protocol called for the use of polymerase chain reaction ("PCR") DNA testing and for repeating the Western blot blood tests performed in May 1997. The protocol would require that a series of ten urine specimens and a single blood specimen be taken from Sophia over a ten-week period.

"Michael filed an opposition to the motion for physical examination and testing. Eugenia's motion, Michael's opposition, and supplemental memoranda filed by each were supported by affidavits of their respective expert witnesses. Drs. Shoemaker and Lionetti, and Zdzislaw Fiutowski, M.D., a general practitioner who had examined Sophia in 1994 and 1995, in Michigan, submitted affidavits in support of Eugenia's motion. They opined, in essence, that symptoms of Lyme disease and symptoms of Alzheimer's disease can be similar; that advanced testing techniques such as PCR DNA testing are more effective in diagnosing Lyme disease than are the tests Sophia underwent [in] 1997; and that, if Sophia were found to be infected by the agent that causes Lyme disease, she could be treated for it.

"Dr. Fiutowski did not opine about whether Sophia's dementia would lessen or improve if she were treated for Lyme disease. Dr. Lionetti addressed that topic in his affidavit, saying only, 'One would hope to see improvement in [Sophia's] neuropsychological status within three months to a year of successful therapy.' He acknowledged, however, that therapy is not always successful, *i.e.*, that it does not always result in the patient no longer being infected with the agent that causes Lyme disease. In his affidavit, Dr. Shoemaker observed: 'What benefit will come to Mrs. Foley if she is tested for Lyme? I have nothing to correct the progressive cerebral atrophy of Mrs. Foley ... Mrs. Foley won't regrow her atrophic brain. Mr. Foley won't have his wife back to care for his daughter.'

"Michael submitted affidavits and/or deposition testimony by Dr. Blum, George C. Samaras, M.D. (another of Sophia's treating doctors), and Andrew R. Pachner, M.D. Dr. Samaras attested not only that Sophia had tested negative for Lyme disease under the CDC protocol administered in 1997 but also that in the 8 years she had been his patient, she never had presented any clinical symptoms of Lyme disease. Dr. Samaras opined that, based on his experience in treating Sophia, she would need to be sedated even to draw a blood sample.

"In Dr. Blum's deposition testimony, from 1997, he opined that Sophia has Alzheimer's disease, that she does not have Lyme disease, that her prognosis is poor, and that Alzheimer's disease only can be definitively diagnosed on autopsy. Dr. Pachner opined that to a reasonable degree of medical certainty, and based on the tests administered in 1997, Sophia does not have Lyme disease and Lyme disease 'can be ruled out as a cause of [her] dementia.' "

The Circuit Court held hearings on the motion for an examination and testing on two different dates, and thereafter the court issued an opinion and an order granting the motion. Michael filed a motion for reconsideration which the Circuit Court denied, and thereafter he filed a notice of appeal. The Court of Special Appeals, in an unreported opinion, held that the order for an examination was appealable under the collateral order doctrine, held that the Circuit Court had abused its discretion in ordering an examination, and vacated the Circuit Court's order.

Eugenia filed a petition for a writ of certiorari, challenging both the Court of Special Appeals' holding that the order was appealable and the appellate court's holding that the Circuit Court's order represented an abuse of discretion. This Court granted the petition, *In re Sophia Foley*, 368 Md. 239, 792 A.2d 1177 (2002), and, as previously indicated, we shall reverse on the ground that the order was not appealable. Accordingly, we shall not reach the merits of the controversy.

The parties, as well as the Court of Special Appeals, all agreed that the Circuit Court's order was not appealable as a final judgment in the traditional sense, that the order was entirely interlocutory, and that it was not an appealable interlocutory order under Maryland Code (1974, 2002 Repl. Vol.), § 12–303 of the Courts and Judicial Proceedings Article, designating certain interlocutory orders as immediately appealable. The respondent and the Court of Special Appeals relied solely upon the so-called collateral order doctrine.

The "collateral order doctrine 'treats as final and appealable a limited class of orders which do not terminate the litigation in the trial court.'" *Bunting v. State,* 312 Md. 472, 476, 540 A.2d 805, 807 (1988), quoting *Public Service Comm'n v. Patuxent Valley,* 300 Md. 200, 206, 477 A.2d 759, 762 (1984). The doctrine is a very limited exception to the principle that only final judgments terminating the case in the trial court are appealable, and it has four requirements. As summarized by Judge Wilner for the Court in *Pittsburgh Corning v. James,* 353 Md. 657, 660–661, 728 A.2d 210, 211–212 (1999),

> "[w]e have made clear, time and again, as has the United States Supreme Court, that the collateral order doctrine is a very narrow exception to the general rule that appellate review ordinarily must await the entry of a final judgment disposing of all claims against all parties. It is applicable to a 'small class' of cases in which the interlocutory order sought to be reviewed (1) conclusively determines the disputed question, (2) resolves an important issue, (3) resolves an issue that is completely separate from the merits of the action, *and* (4) would be effectively unreviewable if the appeal had to await the entry of a final judgment. *See Peat & Co. v. Los Angeles Rams,* 284 Md. 86, 92, 394 A.2d 801, 804 (1978); *Clark v. Elza,* 286 Md. 208, 213, 406 A.2d 922, 925 (1979); *Shoemaker v. Smith,* 353 Md. 143, 725 A.2d 549 (1999)."

*See In re Franklin P.,* 366 Md. 306, 327, 783 A.2d 673, 686 (2001), where Judge Cathell for the Court recently emphasized: "The four elements of the test are conjunctive in nature

and in order for a prejudgment order to be appealable and to fall within this exception to the ordinary operation of the final judgment requirement, each of the four elements must be met." *See also Jackson v. State,* 358 Md. 259, 266–267, 747 A.2d 1199, 1203 (2000).

Furthermore, in Maryland the four requirements of the collateral order doctrine are very strictly applied, and appeals under the doctrine may be entertained only in extraordinary circumstances. *Pittsburgh Corning v. James, supra,* 353 Md. at 666, 728 A.2d at 214; *Shoemaker v. Smith, supra,* 353 Md. at 169, 725 A.2d at 563; *Bunting v. State, supra,* 312 Md. at 482, 540 A.2d at 809. On numerous occasions recently, we have summarily reversed appellate judgments where appeals were entertained under the collateral order doctrine, and we ordered the dismissal of such appeals. *See, e.g., Housing Authority v. Smalls,* 369 Md. 224, 798 A.2d 579 (2002); *Orthodox Jewish Council v. Abramson,* 368 Md. 1, 791 A.2d 129 (2002); *Peck v. DiMario,* 362 Md. 660, 766 A.2d 616 (2001); *Bowers v. Callahan,* 359 Md. 395, 754 A.2d 388 (2000); *Dennis v. Folkenberg,* 354 Md. 412, 731 A.2d 883 (1999); *Samuels v. Tschechtelin,* 353 Md. 508, 727 A.2d 929 (1999).

In the case at bar, the order for an examination was a discovery order pursuant to the discovery rules. "This Court has consistently held that discovery orders, being interlocutory in nature, are not ordinarily appealable prior to a final judgment terminating the case in the trial court." *Montgomery Co. v. Stevens,* 337 Md. 471, 477, 654 A.2d 877, 880 (1995), and cases there cited. *See also Goodwich v. Nolan,* 343 Md. 130, 141 n. 8, 680 A.2d 1040, 1045 n. 8 (1996), and cases there cited. As pointed out in *Stevens; Nolan,* and numerous other cases, generally such orders do not meet the requirements of the collateral order doctrine.

The Court of Special Appeals held that the discovery order in the present case satisfied the four requirements of the collateral order doctrine, namely that it (1) conclusively determined the disputed question, (2) decided an important issue,

(3) resolved an issue that was completely separate from the merits of the action, and (4) would be effectively unreviewable from an appeal from the entry of a final judgment. We question whether the order for a medical examination, simply in an effort to ascertain the actual facts pertinent to the guardianship controversy, met either of the first two requirements of the collateral order doctrine. Assuming *arguendo*, however, that the order did conclusively determine some disputed question and did resolve an important issue, it clearly failed to meet the third and fourth requirements.

■ The order for an examination was obviously not completely separate from the merits of the controversy. On the contrary, it was a typical discovery order aimed at ascertaining critical facts upon which the outcome of the guardianship controversy might depend. In fact, the Court of Special Appeals implicitly recognized that the examination issue was not separate from the merits, as the appellate court stated that it was "[s]kipping [from the second] to the fourth collateral order doctrine factor." The court's later discussion of the examination order was entirely intertwined with its discussion of who should be the guardian or co-guardians of Sophia.

■ Turning to the fourth requirement of the collateral order doctrine, the Court of Special Appeals held that the discovery order would be effectively unreviewable on appeal because, "[i]f Michael prevails in the guardianship case but cannot take an interlocutory appeal of this order, Sophia's right [asserted entirely by Michael] to refuse to submit to an examination nevertheless will have been lost." [2] The same, however, could be said with regard to *any* order for a mental or physical examination under Rule 2–423. More broadly, it could be said anytime a trial court grants a discovery order. If an objecting defendant is ordered by a trial court to submit

---

2. The Court of Special Appeals pointed out that, "[t]o be sure, Sophia is not competent to make medical decisions for herself. * * * Michael, as Sophia's health care agent, is authorized to exercise Sophia's common law right to submit—or not to submit—to medical treatment and testing."

to a deposition, or answer interrogatories, or produce documents, or admit certain facts, and if that defendant ultimately prevails when the trial is terminated, the defendant's asserted "right" to resist the discovery on common law, statutory, or constitutional grounds will have been lost.

The Court of Special Appeals' reasoning, with respect to the fourth collateral order doctrine requirement, would make any order granting discovery immediately appealable. Nevertheless, we have made it clear that discovery orders are only rarely appealable under the collateral order doctrine. The only circumstance in which we have upheld the appealability of interlocutory discovery orders involves a singular situation far removed from the facts of the instant case. *Montgomery Co. v. Stevens, supra,* 337 Md. 471, 654 A.2d 877; *Public Service Comm'n v. Patuxent Valley, supra,* 300 Md. 200, 477 A.2d 759.

This Court has indicated that the fourth requirement of the collateral order doctrine, *i.e.,* that an issue is not effectively reviewable after a final judgment terminating the case, should be deemed satisfied only in

> "a very few ... extraordinary situations. Otherwise, ... there would be a proliferation of appeals under the collateral order doctrine. This would be flatly inconsistent with the long-established and sound public policy against piecemeal appeals." *Bunting v. State, supra,* 312 Md. at 482, 540 A.2d at 809.

*See also Pittsburgh Corning v. James, supra,* 353 Md. at 666, 728 A.2d at 214; *Shoemaker v. Smith, supra,* 353 Md. at 169–170, 725 A.2d at 563. The case at bar is not one of those "extraordinary situations."

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED, AND CASE REMANDED TO THAT COURT WITH DIRECTIONS TO DISMISS THE APPEAL. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENT.*