REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 673

September Term, 2013

TYRONE FRANCIS, ET AL.

v.

MICHAEL BRIAN JOHNSON, JR.

Eyler, Deborah S.,
Graeff,
Berger,

JJ.

Opinion by Graeff, J.

Filed: October 6, 2014

This case arises from a complaint that Michael Brian Johnson, Jr. ("Mr. Johnson"), appellee, through his mother and next friend, Kathryn McDonald, and his father and next friend, Michael Brian Johnson, Sr. ("Michael, Sr."), filed in the Circuit Court for Baltimore City against three police officers with the Baltimore City Police Department ("BCPD") – Tyrone S. Francis, Milton G. Smith, III, and Gregory Hellen, appellants.[1] The complaint alleged a violation of Articles 24 and 26 of the Maryland Declaration of Rights (Count I), false imprisonment (Count II), battery (Count III), and, assault (Count IV) based on the officers' actions in taking him from Baltimore in a police van, assaulting him, breaking his phone, and then dropping him off in Howard County, in the rain, without shoes, socks or a way home.

A jury found in favor of Mr. Johnson, awarding compensatory damages in the amount of $465,000 and $35,000 in punitive damages. The court subsequently granted, in part, the officers' motion for judgment notwithstanding the verdict ("JNOV"), striking the $1,000 punitive damages award against Detective Hellen and finding the award of compensatory damages to be excessive.

On appeal, the officers present the following questions for our review, which we have revised, as follows:

1. Did the circuit court err in admitting evidence of a similar incident relating to another individual?

2. Did the circuit court err in failing to further reduce the damages award?

---

[1] During trial, because Mr. Johnson was 19 years old and no longer a minor, the court granted the motion to dismiss Mr. Johnson's parents as parties.

3.      Did the circuit court err in allowing the jury to consider the issue of malice?

For the reasons set forth below, we agree that the damages award should be reversed, in part.  Otherwise, we affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

The complaint alleged that, on Thursday, May 4, 2009, at approximately 6:30 p.m., Mr. Johnson was in front of his cousins' house at 1648 North Gilmor Street with a group of teenagers.  A BCPD van pulled up, and an officer inside the van told the group: "Keep it moving."  The teens left the area and walked around the block to a playground.  After some time, they returned to 1648 North Gilmor Street.

The BCPD van came back, and the police officer sitting on the passenger side of the van, Detective Hellen, rolled down the window and told Mr. Johnson to come over to the van.  Mr. Johnson did so, and the driver of the van, Detective Francis, commented on his "nice watch."  A third police officer in the back of the van, Detective Smith, stated: "If you look at me the wrong way again, I am going to ram this stick up your ass."  Mr. Johnson responded: "Man you ain't going to do nothing," and he walked away.

Detective Francis then backed up the van, and Detective Smith got out, grabbed Mr. Johnson and pulled him into the back of the van.  Detective Smith began hitting him in the legs with his police baton, and he placed his hands around Mr. Johnson's neck, choking him.  Detective Smith then took Mr. Johnson's cell phone, broke it in half, and threw it out the window.  Detective Francis told Detective Smith that he would "keep driving until you

say stop." Detective Smith did not tell Detective Francis to stop until they had arrived in Ellicott City, Maryland.

Detective Francis told Mr. Johnson to give him his shoes. Detective Hellen told Detective Smith to "take his socks too." Mr. Johnson responded: "Man it is cold and raining," to which Detective Smith responded: "We don't care." Detective Smith then took off Mr. Johnson's socks, opened the door to the van, and pushed Mr. Johnson out onto the grass.

Mr. Johnson walked to a gas station and called 911. The Howard County Police Department ("HCPD") responded and contacted the BCPD, asking to meet at the county line to transfer Mr. Johnson. The BCPD responded that it did not do transfers to take people home. The HCPD drove Mr. Johnson back to his home in Baltimore City.

The complaint alleged that the officers were "acting . . . within the scope of their employment as Baltimore City Police Officers" when the foregoing occurred, and they "maliciously, intentionally, carelessly, recklessly, with gross negligence, wantonly, willfully, wrongfully, unreasonably, with reckless disregard for human life; and without justification assaulted, battered, and detained" Mr. Johnson. Mr. Johnson sought compensatory damages in the amount of ten million dollars ($10,000,000) and punitive damages in the amount of fifteen million dollars ($15,000,000).

Trial was held on January 17-25, 2013. At the start of trial, counsel for the officers moved *in limine* to exclude any reference to the alleged abduction of Shawnquin Woodland,[2] which involved the same officers and occurred approximately one hour prior to the incident with Mr. Johnson. Counsel argued that any such evidence was irrelevant, and that Mr. Johnson was seeking to introduce that evidence to prejudice the jury by attempting to show that "these officers were riding around kidnapping people." Mr. Johnson's counsel responded that the evidence of Mr. Woodland's abduction was being offered pursuant to Md. Rule 5-404(b) to show proof of motive and to show that the officers' actions were part of a common scheme.

The court denied the motion *in limine*. It began by stating that, pursuant to *Ruffin Hotel Corporation of Maryland v. Gasper*, 418 Md. 594, 625 (2011), Md. Rule 5-404(b) applied only to evidence offered by the State against a defendant in a criminal case; it did not apply in the civil context. Applying the applicable civil rules, the court addressed whether the evidence was relevant. In that regard, the court stated:

> The evidence that's been . . . proffered to me is that an incident that occurred . . . less than an hour prior to the incident in question at a location that was at or near the location of the incident in question. The incident involved all three of the same defendants. They were obviously . . . working as police officers at that time. They were driving the same vehicle, an unmarked van. At that time from what's been proffered to me and what's been shown is that they used their police powers, their . . . presence as police officers to take an individual into custody in the van.

---

[2] The spelling of Shawnquin is inconsistent throughout the record and the briefs. We shall use this spelling for consistency.

[T]hereafter the individual is in the van and the officers allegedly . . . make statements to that . . . particular person, exerting their influences, which I assume to be characterized, again, these are allegations at this point in time, of intimidation in an attempt to, in a sense to exert their influence. . . . And after . . . having the person in the van for a period of time, then, in fact, they then mete out the same type of punishment, meaning driving them to a far off location and basically ejecting the person from the van.

It seems to me under [Rule] 401 that's clearly going to be relevant evidence. They're clearly and these, the contested issues in this case are fairly obvious, but for instance, the . . . that particular evidence being, I'd . . . say arguably not just a common scheme but part of the same scheme . . . .

\*\*\*

[T]he same scheme with Mr. Woodland and with Mr. Johnson. So I find that certainly it has relevance among many different things . . . for instance . . . whether or not the defendants acted reasonably and took actions that were not reasonably necessary, whether they acted with or without malice, and whether they acted with or without justification, whether they acted intentionally and knowingly in carrying out this alleged act of intimidation. And clearly also relevant to whether or not the plaintiff, himself, had given his consent.

After finding that the evidence was relevant, the court addressed whether the probative value of the evidence substantially outweighed the danger of unfair prejudice pursuant to Md. Rule 5-403. In that regard, the court stated that the evidence that's going to be provided "goes to the crux of this case, what exactly was the intent of the parties and whether or not the plaintiff consented." Although the evidence "will have substantial impact on this trial, I do find . . . that . . . the probative value significantly outweighs any danger of unfair prejudice."

Mr. Woodland was Mr. Johnson's first witness. He testified that, on May 4, 2009, he was 15 years old. He lived on Pennsylvania Avenue in Baltimore, approximately three

blocks from North Gilmor Street, where he sometimes would "hang out" with his friends. That day, Mr. Woodland was outside standing on North Gilmor Street talking to his friend when he observed a blue van with tinted windows pull up. He could see three people in the van. Mr. Woodland was laughing at a joke that his friend had made, and when the van pulled up, the driver of the van, Detective Francis, asked him: "What was funny." Mr. Woodland did not respond. The three officers then got out of the van and asked Mr. Woodland for his name. Again, he did not respond because he "wasn't doing nothing wrong."

The officer sitting in the back of the van, Detective Smith, said that Mr. Woodland "thought [he] was tough" and asked him "what was [he] laughing at." Detective Smith then placed Mr. Woodland in handcuffs, told him that he "needed to learn respect," and placed Mr. Woodland in the van. Mr. Woodland went to sit down on the seat, and Detective Smith told him that he "wasn't good enough to sit in a seat," and he "had to sit on the floor." When the van drove away, Detective Francis stated that he wanted to "see [Mr. Woodland] dead in three years," and he wanted to "scrape [him] off the street." Detective Francis and Detective Smith joked that they were going to take Mr. Woodland to Ocean City, strip him naked, and take him to the train tracks and leave him there. Detective Hellen, who was sitting in the front passenger seat of the van, did not say anything.

After approximately twenty-five minutes of driving, the van slowed down. Detective Smith took off the handcuffs, and without waiting for the van to come to a complete stop, pushed Mr. Woodland out of the van near a group of men standing on the

corner, yelling "thanks for the information." Mr. Woodland had not given the officers any information. Mr. Woodland, who had no money and no cell phone, got up and began walking back to West Baltimore. It took him approximately 45 minutes to walk home.

When Mr. Woodland got back to North Gilmor Street, he saw Mr. Johnson and Myron Evans. Mr. Woodland told Mr. Johnson and Mr. Evans what had happened to him.

Sometime thereafter, the same blue van with the same officers came through North Gilmor Street again and drove by Mr. Woodland and his friends. The van stopped, and Detective Francis said that Mr. Woodland was a "fast motherfucker." Mr. Woodland walked away down the street.

Mr. Woodland later saw the van stopped and the officers yelling at Mr. Johnson. Mr. Johnson walked away from the van, but Detective Smith got out from the back of the van, grabbed Mr. Johnson's shirt, and pulled him into the van. The van drove away. Mr. Woodland did not speak to Mr. Johnson again until the next day. He did not speak to any police officer about the incident until a few weeks later, when they contacted him.

Mr. Johnson testified on his own behalf. On May 4, 2009, Mr. Johnson was 15 years old. That day, after school, he went home, dropped his books off, changed his clothes, took his father's cell phone from his house, and went to his cousin's house at 1648 North Gilmor Street. Mr. Johnson was playing video games with his cousin, Myron Evans, when they heard people outside talking. They went outside to see what was going on and saw Mr. Woodland walking down the street. Mr. Woodland looked "sluggish and lost . . .

dehydrated." When Mr. Woodland reached Mr. Johnson and Mr. Evans, they had a conversation that made Mr. Johnson "wonder what they was going to do next or was they going to come back." At the time of the conversation, Mr. Johnson noticed a blue van with tinted windows in the vicinity. The van pulled over, and the driver of the van, Detective Francis, stated to Mr. Woodland that "he was a fast motherfucking walker." The van then pulled away, and Mr. Woodland left.

A short while later, as Mr. Johnson and Mr. Evans were sitting in front of 1648 North Gilmor Street, Mr. Johnson observed the van, followed by a white Nissan, driving through the neighborhood. The third or fourth time the van and the Nissan drove down the block, one of the occupants of the van told Mr. Johnson to "keep it moving." Mr. Johnson and Mr. Evans then walked to a nearby playground. Corey Taylor, another friend, was at the playground.

While Mr. Johnson, Mr. Evans, and Mr. Taylor were at the playground, they saw the van again, so they went back to North Gilmor Street to try to "get away from them." When they got to North Gilmor Street, the van came back around the corner and pulled up next to Mr. Johnson and Mr. Evans. The van stopped, and Detective Francis stated to Mr. Johnson: "[Y]ou in the black, come here." Mr. Johnson walked to the van. Detective Francis told Mr. Johnson to "stick [his] head in the window," and when Mr. Johnson complied, he saw Detective Smith in the back of the van "swinging a nightstick." Detective Smith asked Mr. Johnson "what [he] was looking at" and told him if he "ever look[ed] at [him] wrong

again," he would "ram this stick up your ass." Mr. Johnson walked away from the van, telling Detective Smith "you ain't going to do nothing." As Mr. Johnson walked away, the van backed up and Detective Smith got out, grabbed Mr. Johnson by the collar, threw him in the van, and hit him in the side of his face with the nightstick.

Detective Smith then told Mr. Johnson to "[s]coot the fuck over." Mr. Johnson sat on the seat behind Detective Hellen, who was in the front passenger seat. The van then pulled away. Detective Smith asked Mr. Johnson if he had any money. He then went into Mr. Johnson's pockets and took his father's cell phone, telling him he would not need it. Detective Smith broke the phone in half and threw the battery out of the window. He told Mr. Johnson: "Y'all's corner [is] . . . going to learn some respect." Detective Francis said that he would continue driving until Detective Smith told him to stop. Detective Hellen never said anything.

Mr. Johnson estimated that he was in the van for a couple of hours. The van stopped in a park in Howard County. Mr. Johnson did not know anyone in Howard County. It was dark outside and pouring rain. When the van stopped, one of the officers told Mr. Johnson to take his shoes off. Detective Smith then snatched his shoes from him. Another officer told Detective Smith to "get his socks, too." Mr. Johnson complained that it was raining, and one of the officers said: "[D]o you think we care?" Detective Smith opened the door and pushed Mr. Johnson out in the grass. The van then pulled away.

Mr. Johnson sat on the ground for a while, trying to figure out what to do. He started walking, and when he came to a Citgo gas station, he called 911, telling the dispatcher that the police had beat him up and dropped him off, and he did not know where he was. Approximately 15 minutes later, a Howard County police officer arrived. The officer drove Mr. Johnson back to his home. After Mr. Johnson returned home, he saw Mr. Taylor, who had Mr. Johnson's shoes and socks.

Mr. Taylor testified that he had seen Mr. Johnson and Mr. Evans at the playground, and they then returned to North Gilmor Street. He observed a blue van stopped a few doors down from Mr. Evans's house. Mr. Johnson walked toward the van and put his head in the window. Mr. Johnson then walked away from the van, but someone got out of the van, grabbed him, and shoved him in the van. The person who shoved Mr. Johnson into the van had a nightstick. Mr. Taylor heard someone say "[s]coot the fuck over." The van then drove off.

Approximately three or four hours later, Mr. Taylor saw the van again. The back passenger door of the van opened and someone threw something out. Mr. Taylor went to see what it was, and he saw Mr. Johnson's shoes with the socks tucked inside. Mr. Taylor picked up the shoes and took them to Mr. Evans's house. Mr. Taylor subsequently went to Mr. Johnson's house and saw Mr. Johnson, who was crying.

Michael, Sr. testified that, after Mr. Evans told him what had happened with his son earlier in the day, he observed his son get out of a Howard County police car. Mr. Johnson

-10-

looked confused and was not wearing any shoes or socks. A few minutes later, Mr. Taylor came around the corner holding his son's shoes. When his son later returned his phone to him, it was broken in two pieces.

Officer Terrence Benn, a member of the HCPD, testified that, on May 4, 2009, he was dispatched to a Citgo gas station on Baltimore National Pike between 7:47 p.m. and 7:49 p.m. to check on the welfare of a person. When he arrived, he found Mr. Johnson, who was damp and not wearing any shoes or socks. Mr. Johnson appeared to be "afraid and a little shaken up." Mr. Johnson asked Officer Benn if he could use his cell phone to call home, and he asked Officer Benn for a ride home. He stated that he had been "snatched up by three undercover officers from West Baltimore," who had broken his phone, taken his shoes and socks, and dropped him off in Howard County. Officer Benn drove Mr. Johnson to his home in Baltimore.

Detective Smith testified that, on May 4, 2009, he was working in plainclothes with Detective Francis and Detective Hellen as a member of the Violent Repeat Offender Squad in the Gilmor Homes housing projects. The Violent Repeat Offender Squad was assigned a blue Dodge Caravan. Mr. Johnson was in the van on that date for the purpose of "gathering intel on violent crimes in the area" pursuant to an ongoing investigation. Similarly, Mr. Woodland earlier was in the van to help the police.

Detective Smith explained that his interaction with Mr. Woodland began after he received a 911 call regarding two males dealing drugs at a red truck in the 1500 block of

North Gilmor Street. When the officers responded to the area, Mr. Woodland and another individual were standing near a red truck. As Detective Smith searched Mr. Woodland, he asked him if he had any information on drugs in the area. Mr. Woodland responded that he did. Detective Smith asked him if he would be willing to give that information to police, and Mr. Woodland responded that he would, but he was unable to do so at that time or place. Detective Smith responded: "That's fine. I'm going to put you in handcuffs and we'll put you in the van." Mr. Woodland agreed. Detective Smith denied telling Mr. Woodland that he was going to "teach him a lesson," nor did he threaten Mr. Woodland. Detective Smith stated that it is common for an officer to handcuff an individual in that high-crime area, even if they have not committed a crime, because the individual "wouldn't want somebody to think that they're just giving police information."

Mr. Woodland got into the van voluntarily, and none of the officers in the van made any threatening statements. Mr. Woodland asked to be dropped off in East Baltimore because he had family in that area. Detective Smith explained that an informant would not want to be dropped off in the same neighborhood where he was picked up by police because individuals in that area would assume that he was giving information to police.

With respect to Mr. Johnson, Detective Smith testified that, after the incident with Mr. Woodland, he observed a male in the same neighborhood wearing a black hoodie and jeans reaching into his waistband. As the officers drove around to investigate why the individual was reaching into his waistband, they saw Mr. Johnson and asked him if he had

-12-

any information regarding drugs in the area. Mr. Johnson responded affirmatively. Detective Smith asked him to walk away from the van. Detective Smith then got out of the van and called for Mr. Johnson to come back. He did this for Mr. Johnson's safety, explaining that he "didn't want to make it look like he was just going to freely get in the van" because he may be labeled as a "'snitch.'" Detective Smith testified that none of the officers threatened Mr. Johnson, struck him with a nightstick, or broke his phone. The officers then drove Mr. Johnson in a "big circle" while he gave the officers information. After gathering information, the officers asked Mr. Johnson where he would like to be dropped off. Mr. Johnson responded that he would like to be dropped off where the van was at that time, on Route 40 in Howard County. Mr. Johnson was not pushed out of the vehicle, and he had his shoes and socks on.

During cross-examination of Detective Smith, counsel for Mr. Johnson asked how often an individual would approach police officers in the Gilmor Homes area to give them information on criminal activity. Detective Smith's answers were: (1) "it was pretty occasional"; (2) it was not likely for somebody to approach officers in that area; and (3) a new informant would not "necessarily [approach] on a daily basis." After some discussion on this area of inquiry, the court informed counsel that it had received a jury note asking: "'If it wasn't common for an informant to come up daily, how did you come by two in one day?'"

Detective Francis and Detective Hellen also testified. They generally corroborated Detective Smith's testimony.

The jury found in favor of Mr. Johnson and awarded compensatory and punitive damages against the officers, as follows.

|  | Count I – Violation of Articles 24 and 26 | Count II – False Imprison-ment | Count III – Battery | Count IV – Assault | Total Compen-satory ("Comp.") Damages ($465,000) | Total Punitive Damages ($35,000) |
|---|---|---|---|---|---|---|
| Detective Francis | Liable $100,000 Comp. $5,000 Punitive | Liable $100,000 Comp. $5,000 Punitive | Not Liable $0 Comp. $0 Punitive | Liable $5,000 Comp. $5,000 Punitive | $205,000 | $15,000 |
| Detective Smith | Liable $100,000 Comp. $5,000 Punitive | Liable $100,000 Comp. $5,000 Punitive | Liable $5,000 Comp. $4,000 Punitive | Liable $5,000 Comp. $5,000 Punitive | $210,000 | $19,000 |
| Detective Hellen | Liable $50,000 Comp. $0 Punitive | Not Liable $0 Comp. $1,000 Punitive | Not Liable $0 Comp. $0 Punitive | Not Liable $0 Comp. $0 Punitive | $50,000 | $1,000 |

Appellants subsequently filed a motion for JNOV and a Motion for New Trial and Remittitur. They alleged, *inter alia*, that: (1) there was no competent evidence to support the

jury's verdict that the injuries to Mr. Johnson were committed with malice; (2) the jury's deliberation was improperly prejudiced by the presence of malice on the verdict sheet; (3) the jury's verdict was improperly prejudiced by Mr. Woodland's testimony regarding his encounter with the officers; and (4) the jury's verdict was excessive and exceeded the cap imposed under the Local Government Tort Claims Act ("LGTCA").[3]

The court granted, in part, and denied, in part, appellants' motions. It found that there was "sufficient evidence to support the jury's verdict in general, and specifically, the jury's finding of malice," noting that the defendants' "own summary of the facts" in their motion substantiated the jury's finding. The court stated that it properly exercised its discretion in admitting Mr. Woodland's testimony regarding his encounter with the defendants.

On the issue of the LGTCA's statutory cap, the court ruled:

As to [Md. Code (2006 Repl. Vol.) § 5-301 *et seq.* of the Courts & Judicial Proceedings Article ("CJP")], only the awards against Defendants Smith and Francis exceeded the statutory cap of $200,000. However, these Defendants are not entitled to any reduction as they were found to have acted with actual malice. Under [CJP] § 5-302(b)(2)(i), "[a]n employee shall be fully liable for all damages awarded in an action in which it is found that the employee acted with actual malice." *See also Smith v. Danielczyk*, 400 Md. 98, 130 (2007) (defendants are covered by [CJP] §§ 5-301 *et seq.* "so long as [intentional torts] were committed within the scope of employment and without actual malice"). Consequently, these claims are without merit.

The court did, however, grant some relief on the amount of damages. The court struck the award of punitive damages against Detective Hellen, stating that the damages were

---

[3] Maryland Code (2006 Repl. Vol.) § 5-301 *et seq.* of the Courts and Judicial Proceedings Article.

-15-

awarded for false imprisonment, but he was found not liable for false imprisonment. It found, however, that the awards of punitive damages against Detectives Smith and Francis were not excessive.

On the issue of compensatory damages, the court found that the awards were "grossly excessive." It stated:

> The Plaintiff was held against his will for approximately one hour. Certainly he suffered from emotional distress but he never received any later medical or psychological treatment and never made any claim for physical injury or economic loss. Considering "(1) the extent and duration of the injuries sustained; (2) their effect on the overall physical and mental health and well-being of the plaintiff; and (3) the physical pain and mental anguish suffered in the past and which may reasonably be experienced in the future," [citing *Hebron Volunteer Fire Dept., Inc. v. Whitelock*, 166 Md. App. 619, 643 (2006)], an award of $465,000 in compensatory damages was far above "the highest amount that a reasonable jury would award." This [c]ourt believes that an award of $300,000 in compensatory, non-economic damages was "the highest amount that a reasonable jury would award" and would "ensure that the award is a 'full and adequate compensation for the plaintiff's injuries.'" *Id.* at 642-43, citing *Brawner v. Hooper*, 151 Md. 579, 595 (1926). Consequently, this [c]ourt will grant the Defendants' motion for new trial on damages unless the Plaintiff agrees to a remittutur of $165,000 resulting in final compensatory damages broken down as follows: Defendant Hellen - $32,000, Defendant Smith - $136,000, and Defendant Francis - $132,000.

The court subsequently ordered that appellants' motion for new trial as to damages only would be granted unless Mr. Johnson agreed to a remittitur of $165,000 on the compensatory damages award. Mr. Johnson's remittitur was entered on May 28, 2013.

This appeal followed.

-16-

## I.

### Admission of Mr. Woodland's Testimony

Appellants contend that the trial court erred in admitting evidence of Mr. Woodland's "abduction" because "it was not relevant to the issues and claims in this case." They assert that "the proposition that [appellants] took [Mr.] Woodland for a ride without his consent could not establish that [they] later took [Mr. Johnson] for a similar ride." Appellants further contend that, even if the evidence had probative value with respect to the incident with Mr. Johnson, it was inadmissible because its prejudicial effect substantially outweighed any probative value. They assert that the evidence was unfairly prejudicial because it was "unnecessary, lacked materiality and had no probative value," and it "could and likely did influence the jury to disregard the evidence or lack of evidence" regarding the incident with Mr. Johnson.

Mr. Johnson contends that the trial court properly exercised its discretion in admitting Mr. Woodland's testimony, asserting that it "sought to prove a number of similarities to the circumstances surrounding the testimony elicited from" Mr. Johnson, and it was offered "precisely to provide proof that [a]ppellants' actions on the day in question supported the proposition that they were undertaking a common scheme or plan in taking juveniles against their will to teach them a lesson of respect for the police." He asserts that, given the temporal proximity of appellants' actions, and the "extraordinarily similar methods employed by the

officers as experienced by" both Mr. Woodland and Mr. Johnson, the evidence was relevant to show a common course of action.

As the Court of Appeals explained in *State v. Simms*, 420 Md. 705, 724-25 (2011), we review a trial court's decision to admit evidence for abuse of discretion, but we conduct an independent analysis of whether evidence is relevant:

> It is frequently stated that the issue of whether a particular item of evidence should be admitted or excluded "is committed to the considerable and sound discretion of the trial court," and that the "abuse of discretion" standard of review is applicable to "the trial court's determination of relevancy." Maryland Rule 5-402, however, makes it clear that the trial court does not have discretion to admit irrelevant evidence. . . . [T]he "de novo" standard of review is applicable to the trial judge's conclusion of law that the evidence at issue is or is not "of consequence to the determination of the action."

*Id.* (quoting *Ruffin Hotel Corp. of Md.*, 418 Md. at 619-20) (citations omitted).

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5-401. "[T]he relevancy determination is not made in isolation. Instead, the test of relevance is whether, in conjunction with all other relevant evidence, the evidence tends to make the proposition asserted more or less probable." *Snyder v. State*, 361 Md. 580, 592 (2000).

Here, appellants' theory of the case was that Mr. Johnson had approached them to offer evidence of drug crimes in the area. Mr. Johnson offered Mr. Woodland's testimony to refute that theory, based on the similarity of the events, involving the same officers and the same location, and occurring within one hour of each other. We agree with the circuit

court that the evidence of the similar incident involving Mr. Woodland was relevant to appellants' motive and intent, as well as whether Mr. Johnson gave his consent to the officers' actions. *See Espina v. Prince George's Cnty.*, 215 Md. App. 611, 653 (2013) (evidence of two prior incidents where the defendant officer was involved in violent encounters with members of the public was admissible to show motive, intent, and *modus operandi*, as well as to rebut officer's testimony regarding his use of force), *cert. granted on other grounds*, 438 Md. 142 (2014).

Once we conclude that the evidence was relevant, we next address whether the circuit court properly determined that the probative value substantially outweighed the danger of unfair prejudice. *See Brethren Mutual Ins. Co. v. Suchoza*, 212 Md. App. 43, 52, *cert. denied*, 434 Md. 312 (2013); Md. Rule 5-403.[4] In balancing probative value against prejudice, we note that "'evidence that prejudices one party or the other, in the sense that it hurts his or her case, is not the undesirable prejudice referred to in Rule 5-403.'" *Odum v. State*, 412 Md. 593, 615 (2010) (quoting LYNN MCLAIN, MARYLAND EVIDENCE: STATE AND FEDERAL § 403:1(b) (2d ed. 2001)). Rather, evidence is considered unfairly prejudicial when

---

[4] Md. Rule 5-403 provides, as follows: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

"'it might influence the jury to disregard the evidence or lack of evidence regarding the particular crime with which [the defendant] is being charged.'" *Id.*[5]

Here, the court found that the evidence was highly probative because it "goes to the crux of this case, what exactly was the intent of the parties and whether or not the plaintiff consented." It concluded that its probative value "significantly outweigh[ed] any danger of unfair prejudice." We agree and certainly "cannot say that the circuit court's decision to admit the evidence was 'removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.'" *Espina*, 215 Md. App. at 653 (quoting *Consol. Waste Indus., Inc. v. Standard Equip. Co.*, 421 Md. 210, 219 (2011)). Accordingly, the circuit court did not abuse its discretion in admitting Mr. Woodland's testimony regarding his encounter with the police one hour before Mr. Johnson was put into the police van.

---

[5] Appellants assert in their reply brief that Mr. Woodland's testimony was inadmissible "other crimes" evidence pursuant to Md. Rule 5-404(b). The Court of Appeals held in *Ruffin Hotel Corp. of Maryland, Inc. v. Gasper*, 418 Md. 594, 625 (2011), however, that Md. Rule 5-404(b) "should continue to be applicable only to evidence offered by the State against the defendant in a criminal case." In civil cases, the admissibility of relevant evidence that presents the "possibility of [unfair] prejudice is to be dealt with pursuant to [Md.] Rule [5-] 403."

## II.

## Damages

Appellants' next contentions are with respect to the damages award. As indicated, the court agreed that the compensatory damages awarded by the jury were excessive, and it ordered that a new trial would be granted unless Mr. Johnson agreed to a remittitur of $165,000 in damages, as follows: Detective Hellen - $32,000; Detective Smith - $136,000; and Detective Francis $132,000, for a total compensatory damages award of $300,000.

Appellants argue on appeal that the damages should be reduced further, for several reasons. First, they argue that the damages should be reduced pursuant to the LGTCA. Second, they argue that the jury damages award was improper because it was duplicative and "irreconcilably inconsistent." Third, they argue that the award should have been reduced more because "even the revised $300,000 [was] excessive considering the testimony" of Mr. Johnson.

## A.

## LGTCA

Appellants contend that, pursuant to the LGTCA, Mr. Johnson's compensatory damages should have been limited to $200,000. They argue that, "because the officers were acting in the scope of their duties, they are covered by the LGTCA and the local government

entity – Baltimore City – is liable for any damages arising out of their actions."[6] They assert

that the trial court erred in holding that the LGTCA cap does not apply because the jury

found that they acted with malice.

Mr. Johnson contends that the damage awards were not in excess of the LGTCA cap,

noting that the case does not involve "an action against a local government."  He states that,

pursuant to CJP § 5-302(b)(1), an employee of a local government "shall be fully liable" for

damages awarded where it is determined that the employee acted with malice.

Because our analysis hinges on the circuit court's interpretation and application of the

LGTCA, we review the decision below *de novo.  Bd. of Educ. of Prince George's Cnty. v.

Marks-Sloan*, 202 Md. App. 59, 63 (2011), *aff'd on other grounds*, 428 Md. 1 (2012).  As

the Court of Appeals has made clear, "[t]he cardinal rule of statutory interpretation is to

ascertain and effectuate the real and actual intent of the Legislature."  *Lockshin v. Semsker*,

412 Md. 257, 274 (2010).  In this regard, we apply well-settled rules:

> We begin the statutory interpretation process by looking to the plain
> language of a statute, giving the words their natural and ordinary meaning.
> *Breslin* [*v. Powell*], 421 Md. [266,] 286 . . . [(2011)] (citing *State Dep't of
> Assessments and Tax'n v. Md.-Nat'l Capital Park & Planning Comm'n*, 348
> Md. 2, 13 . . . (1997)). To determine the plain meaning of language, we
> consider the statutory scheme in which the particular provision or provisions
> appear. *State v. Pagano*, 341 Md. 129, 133 . . . (1996) (citing *Kaczorowski v.
> Mayor of Balt.*, 309 Md. 505, 514 . . . (1987)) ("[The meaning of the plain
> language] is controlled by the context in which it appears."). If the language

---

[6] The Local Government Tort Claims Act ("LGTCA") expressly applies to employees
of the BCPD.  *Houghton v. Forrest*, 412 Md. 578, 591-92 (2010).

is clear and unambiguous on its face, our inquiry ends. *Id.* (citing *Marriot Emps. Fed. Credit Union v. MVA*, 346 Md. 437 . . . (1997)).

*Polek v. J.P. Morgan Chase Bank*, 424 Md. 333, 351 (2012).

The relevant portions of the LGTCA provide as follows:

(a) *Government to provide legal defense to employees.* — Each local government shall provide for its employees a legal defense in any action that alleges damages resulting from tortious acts or omissions committed by an employee within the scope of employment with the local government.

(b) *Immunity; exceptions.* — (1) Except as provided in paragraph (2) of this subsection, a person may not execute against an employee on a judgment rendered for tortious acts or omissions committed by the employee within the scope of employment with a local government.

(2)(i) *An employee shall be fully liable for all damages awarded in an action in which it is found that the employee acted with actual malice.*

(ii) In such circumstances the judgment may be executed against the employee and the local government may seek indemnification for any sums it is required to pay under § 5-303(b)(1) of this subtitle.

CJP § 5-302 (emphasis added).

(a) *Limitation on liability.* — (1) Subject to paragraph (2) of this subsection, the *liability of a local government* may not exceed $200,000 per an individual claim, and $500,000 per total claims that arise from the same occurrence for damages resulting from tortious acts or omissions, or liability arising under subsection (b) of this section and indemnification under subsection (c) of this section.

(2) The limits on liability provided under paragraph (1) of this subsection do not include interest accrued on a judgment.

(b) *When government liable.* — (1) Except as provided in subsection (c) of this section, a local government shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government.

(2) A local government may not assert governmental or sovereign immunity to avoid the duty to defend or indemnify an employee established in this subsection.

(c) *Punitive damages; indemnification.* — (1) A local government may not be liable for punitive damages.

CJP § 5-303 (emphasis added).

In *Shoemaker v. Smith*, 353 Md. 143, 161 (1999), the Court of Appeals explained that, in enacting the foregoing provisions,

> "[t]he General Assembly . . . clearly and expressly retained a subjective element for immunity purposes. . . . The Legislature had decided that, *when State personnel act maliciously, they, and not the State, must bear the risk.* The predominant and laudable public policy is to discourage State personnel from acting with malice in the performance of their public duties.

(Emphasis added). Thus, although there is a cap on damages for the local government, where, as here, a police officer is found to have acted with actual malice, he is not shielded by immunity and is liable fully for *all damages awarded*.[7] The circuit court properly rejected the argument that the LGTCA required that the damages against the individual officers be capped at $200,000.

## B.

### Duplicative and Inconsistent Awards

Appellants next contend that, "[b]eyond the reduction mandated by the LGTCA statutory cap, Plaintiff's damages should have been reduced because they were duplicative." In support, they argue that, because "the incident in question constituted a continuous, single occurrence," the jury improperly awarded damages for both the constitutional claims and the

_____

[7] We note that, in *Espina v. Prince George's County*, 215 Md. App. 611, 618 (2013), upon which appellants rely, the original verdict of $11,505,000 was reduced against Prince George's County pursuant to the LGTCA, but there was no argument that it should be reduced against the individual officer.

common law claims on which they were premised, and it improperly "made multiple awards of punitive damages." They also assert that the jury's verdict was improper because it was "irreconcilably inconsistent."

## 1.

## Punitive Damages

We address first the argument regarding punitive damages. As indicated, the jury awarded $35,000 in punitive damages, as follows: (1) Detective Francis - $15,000 - $5,000 for the constitutional claim, $5,000 for false imprisonment, and $5,000 for assault; (2) Detective Smith - $19,000 - $5,000 for the constitutional claim, $5,000 for false imprisonment, $4,000 for battery, and $5,000 for assault; and (3) Detective Hellen - $1,000 for false imprisonment.[8]

Mr. Johnson contends that the argument that there should have been only one award of punitive damages is not preserved for review because appellants made no objection to the form of the verdict sheet with regard to the "alleged duplication of the punitive damages," nor was this issue raised in post-trial motions. In any event, he argues that punitive damages awarded on each individual count was proper.

We will begin with the preservation argument. "Ordinarily, the appellate court will not decide any [] issue unless it plainly appears by the record to have been raised in or

---

[8] As indicated, the circuit court ultimately struck the punitive damage award against Detective Hellen because the jury found him not liable on the charge of false imprisonment.

decided by the trial court." Md. Rule 8-131. Moreover, pursuant to Md. Rule 2-522(b)(5), a party many not "assign as error the submission of issues to the jury . . . unless the party objects on the record before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the objection."

Here, during discussions regarding the verdict sheet, which set forth a space for an amount of damages for each officer and each count, appellants did not make any argument, as they do on appeal, that "multiple awards of punitive damages for the single incident were improper as a matter of law." Nor did they make this argument in their motion for JNOV. Accordingly, because the issue now raised by appellants regarding punitive damages was not raised in or decided by the trial court, we shall not consider it.

**2.**

**Compensatory Damages**

We turn to the argument regarding compensatory damages. With respect to Detective Hellen, appellants argue that the jury's verdict was "irreconcilably inconsistent." With respect to Detectives Smith and Francis, appellants contend that the damage awards were duplicative.

**a.**

**Detective Hellen**

As indicated, the jury found Detective Hellen not liable for false imprisonment, battery, and assault but liable on the constitutional claim. Appellants assert that, "[h]aving

found that [Detective] Hellen did not take part in the unlawful acts and therefore having ruled out the only factual predicates for constitutional liability, the jury could not find [Detective] Hellen liable for the constitutional claim."

When the jury rendered this verdict, appellants could have raised this issue with the circuit court and asked the court to send the jury back to clarify what appellants believed to be an inconsistent verdict. Appellants, however, did not raise the issue below. In the context of inconsistent verdicts, it is clear that the failure to raise the issue in the circuit court constitutes a waiver of the right to raise the issue on appeal. *See Tate v. State*, 182 Md. App. 114, 136 (to preserve the claim that a jury has rendered inconsistent verdicts, "a defendant must note his objection to the inconsistent verdict while the trial court has an opportunity to remedy the error") (quoting *Price v. State*, 405 Md. 10, 41-42 (2008)), *cert. denied*, 406 Md. 747 (2008). Accordingly, this issue is not preserved for this Court's review.

**b.**

**Detectives Francis and Smith**

Appellants contend that compensatory damages awarded against Detectives Smith and Francis for the constitutional claim and the tort claims were duplicative because they were based on the same facts. As indicated, the jury awarded compensatory damages as follows: (1) Detective Francis - $100,000 for the constitutional claim,[9] $100,000 for false

_____

[9] Article 24 provides:

(continued...)

imprisonment, and $5,000 for assault; (2) Detective Smith - $100,000 for the constitutional claim, $100,000 for false imprisonment, $5,000 for battery, and $5,000 for assault. Appellants argue that, because the counts were based on a single set of facts, they presented a single claim for damages.

Mr. Johnson argues that the damages were not duplicative. He baldly asserts, without elaboration, that the "single set of facts" "produced a set of 'wrongs' independent of one another with different elements and separate claims for damages. He contends that the appellants' claim that the award for the constitutional violation was duplicative because it was based solely on a finding that appellants committed false imprisonment and assault is "pure speculation as there is no evidence as to what formed the basis of the jury's finding constitutional violations, nor did the [a]ppellants at any time ask to submit such an issue to the jury."

In this regard, appellants did argue below, during discussions regarding the verdict sheet, that the count for the constitutional claim should not be a separate count, as that count was subsumed by the substantive counts on the facts of the case. The circuit court was not persuaded, stating that it was "appropriate for the [c]ourt and [p]arties to know" what the jury

[9](...continued)
That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.

MD. DECL. RIGHTS ART. 24.

found regarding each count. The court did state, however, that "maybe this is something to visit if there is a verdict."

When the jury did come back with a verdict for Mr. Johnson, awarding damages for both the constitutional claim and the tort claims, appellants failed to argue, as they do on appeal, that the damages were improperly duplicative. It could be argued that, similar to an inconsistent verdict claim, this type of argument is waived if not brought to the attention of the court when the verdict is rendered, when the court could have asked the jury to specify the basis for its finding, i.e., whether the damages awarded for the constitutional claim was based on the same facts as the tort claims. In this case, however, no such preservation argument was raised on appeal, and there was no argument below that the constitutional claim was based on facts different from those underlying the tort claims. Accordingly, we will address this issue on the merits.

The Maryland appellate courts have made clear that there can be only one recovery of damages for one wrong or injury. *Smallwood v. Bradford*, 352 Md. 8, 24 (1998) ("Duplicative or overlapping recoveries in a tort action are not permissible."); *Shapiro v. Chapman*, 70 Md. App. 307, 315 (1987) (plaintiffs "would not have been permitted to recover twice for the same tort merely because the wrong gave rise to alternative theories of recovery"). Here, we agree with appellants that the jury's verdict permitted Mr. Johnson to "recover twice for the same tort merely because the wrong gave rise to alternative theories of recovery." *Shapiro*, 70 Md. App. at 315. The court's instructions to the jury, as well as

the closing arguments of counsel, provided no basis for the jury to find a constitutional violation based on anything other than the facts supporting the tort claims. Accordingly, the $100,000 damages awarded on the constitutional claim was duplicative, and the compensatory damage awards should be revised as follows: (1) Detective Francis - $100,000 for false imprisonment and $5,000 for assault, for a total of $105,000; and (2) Detective Smith - $100,000 for false imprisonment, $5,000 for battery, and $5,000 for assault, for a total of $110,000.

## C.

### Excessiveness

Appellants also argue that, "[b]eyond all of" the foregoing, the court "should have found the award excessive and reduced it more than it did." In support, they state that Mr. Johnson presented no evidence of "seeking, receiving, or needing psychological treatment." They cite no authority for the proposition that such evidence was required to support the jury's verdict.

As appellants acknowledge, the circuit court has wide discretion regarding whether to reduce a verdict as excessive. *See John Crane Inc. v. Puller*, 169 Md. App. 1, 52, *cert. denied*, 394 Md. 479 (2006). A trial court abuses its discretion only when "'no reasonable person would take the view adopted by the [trial] court,'" or when the court acts "'without reference to any guiding rules or principles.'" *King v. State*, 407 Md. 682, 697 (2009) (quoting *North v. North*, 102 Md. App. 1, 13 (1994)). Here, the court exercised its discretion

to reduce the jury's verdict as excessive.  We perceive no abuse of discretion by the trial court in its decision reducing the jury's verdict, which we have reduced further.

## III.

## Malice

Appellants' final argument is that there was not sufficient evidence that the officers acted with actual malice.  Accordingly, they request that this Court strike the award of punitive damages.

Mr. Johnson agrees that proof of malice is necessary to establish punitive damages, but he argues that he "met his burden of proof in proving malice by clear and convincing evidence."  He asserts that there was "ample evidence to support the jury's finding of actual malice," stating that the jury could have found "that the appellants had the intent to inflict an injury upon [him], that they had acted at all times in concert and that such actions were with an improper motive of ill-will or with a motive other than bringing [Mr. Johnson] to justice."

The circuit court denied the motion for JNOV, finding that there was sufficient evidence to support the jury's finding of malice.  "A motion for judgment notwithstanding the verdict [JNOV] under Rule 2-532 'tests the legal sufficiency of the evidence.'" *Gallagher v. H.V. Pierhomes, LLC*, 182 Md. App. 94, 101 (2008) (quoting *Impala Platinum, Ltd. v. Impala Sales (USA), Inc.*, 283 Md. 296, 326 (1978)).  "'[A] party is entitled to judgment notwithstanding the verdict . . . when the evidence at the close of the case, taken

in the light most favorable to the nonmoving party, does not legally support the nonmoving

party's claim or defense.'" *Elste v. ISG Sparrows Point, LLC*, 188 Md. App. 634, 648 (2009)

(quoting *Giant Food, Inc. v. Booker*, 152 Md. App. 166, 177 (2003)), *cert. denied*, 412 Md.

495 (2010).

> In reviewing the denial of a motion for JNOV, we assess

> "whether on the evidence adduced, viewed in the light most favorable to the non-moving party, any reasonable trier of fact could find the elements of the [claim] by a preponderance of the evidence. If there is even a slight amount of evidence that would support a finding by the trier of fact in favor of the [non-movant], the motion for judgment should be denied."

*State v. Jones*, 197 Md. App. 638, 663(2011) (quoting *Washington Metro. Area Transit Auth.*

*v. Djan*, 187 Md. App. 487, 491-92 (2009)), *rev'd on other grounds*, 425 Md. 1 (2012).

This Court recently explained the evidence required to support a finding of malice as

follows:

> "In the qualified immunity context, the Court of Appeals [has] affirmed that 'malice' has an 'actual malice' meaning, and requires a determination of whether the arresting officer's 'conduct, given all of the existing and antecedent circumstances, was motivated by ill will, [or] by an improper motive . . . . [T]hat motive or animus may exist even when the conduct is objectively reasonable.' *Shoemaker*[, 353 Md. at 164 . . .]. Malice can be established by proof that the officer 'intentionally performed an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff.' *Id.* at 163 (quoting *Leese v. Baltimore County*, 64 Md. App. 442, 480 . . . (1985), *cert. denied*, 305 Md. 106 (1985))."

*Espina*, 215 Md. App. at 655 (quoting *Thacker v. City of Hyattsville*, 135 Md. App. 268, 300

(2000)). Malice may be inferred from the circumstances. *Leese*, 64 Md. App. at 480.

Here, there was overwhelming evidence to support a finding of malice on the part of Detectives Smith and Francis. Appellants approached Mr. Johnson on the street and began questioning him. Detective Smith advised Mr. Johnson that if he looked at Detective Smith the wrong way, Detective Smith would "ram th[e] stick up [his] ass." Detective Smith then threw Mr. Johnson into the van, searched him for money, and broke his father's cell phone. Mr. Johnson testified that he was driven around for a couple of hours before being pushed out of the van in the rain, outside of the city limits, with no money, cell phone, shoes or socks. This evidence, along with the evidence of similar actions with respect to Mr. Woodland, was sufficient for the jury to find that appellants' actions were intentionally performed without legal justification or excuse, but with an evil or rancorous motive influenced by hate, and with the purpose to deliberately and willfully injure Mr. Johnson. There was no error by the circuit court in this regard.

**JUDGMENT AFFIRMED, IN PART, REVERSED, IN PART. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID 75% BY APPELLANTS AND 25% BY APPELLEE.**